EXHIBIT A

# RESTATED CERTIFICATE
## OF INCORPORATION
### OF
## VERIZON COMMUNICATIONS INC.

1. Corporate Name . The name of the corporation is Verizon Communications Inc. (the "Corporation").

2. Registered Office . The address of the registered office of the Corporation is 1209 Orange Street, in the City of Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

3. Corporate Purpose . The nature of the business of the Corporation or the purposes of the Corporation to be conducted or promoted is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware, as amended from time to time (the "GCL").

4. Capital Stock .

A. Authorized Shares . The total number of shares of all classes of stock which the Corporation shall have the authority to issue is 4,500,000,000 shares, of which 4,250,000,000 shares are Common Stock, $.10 par value per share, and 250,000,000 shares Series Preferred Stock, $.10 par value.

B. Authority of Board to Fix Terms of Series Preferred Stock . The Board of Directors of the Corporation is hereby expressly authorized at any time and from time to time to provide for the issuance of all or any shares of the Series Preferred Stock in one or more classes or series, and to fix for each such class or series such voting powers, full or limited, or no voting powers, and such distinctive designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof, as shall be stated and expressed in the resolution or resolutions adopted by the Board of Directors providing for the issuance of such class or series and to the fullest extent as may now or hereafter be permitted by the GCL, including, without limiting the generality of the foregoing, the authority to provide that any such class or series may be (i) subject to redemption, at such time or times and at such price or prices; (ii) entitled to receive dividends (which may be cumulative or non-cumulative) at such rates, on such conditions, and at such times, and payable in preference to, or in such relation to, the dividends payable on any other class or classes or any other series; (iii) entitled to such rights upon the dissolution of, or upon any distribution of the assets of, the Corporation; or (iv) convertible into, or exchangeable for,

Dockets.Justia.co

shares of any other class or classes of stock, or of any other series of the same or any other class or classes of stock, or other securities or property, of the Corporation at such price or prices or at such rates of exchange and with such adjustments; all as may be stated in such resolution or resolutions. Unless otherwise provided in such resolution or resolutions, shares of Series Preferred Stock of such class or series which shall be issued and thereafter acquired by the Corporation through purchase, redemption, exchange, conversion or otherwise shall return to the status of authorized but unissued Series Preferred Stock.

5. Board of Directors of the Corporation .

A. Responsibilities . The business and affairs of the Corporation shall be managed under the direction of the Board of Directors.

B. Number . Subject to the right of the Board of Directors to increase or decrease the number of directors pursuant to this Article 5.B., the Board of Directors shall consist of 22 directors. The Board of Directors may increase or decrease the number of directors by the affirmative vote of (a) three-quarters of the entire Board of Directors if the effective date of such increase or decrease is prior to the date on which Raymond W. Smith ceases to be Chairman of the Corporation (hereinafter referred to as the "Retirement Date"), and (b) a majority of the entire Board of Directors if the effective date of the increase or decrease is on or after the Retirement Date.

C. Elections of Directors . Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

D. Nominations for Directors . Except as otherwise permitted in Article 5.E., only persons who are nominated in accordance with the procedures established in the Bylaws shall be eligible for election as directors.

E. Vacancies . Vacancies and newly created directorships may be filled by the Board of Directors, provided that on or prior to the Retirement Date, such action shall be in accordance with the method for the selection of directors set forth in Section 4.16 of the Bylaws.

6. Bylaws . The Board of Directors is expressly authorized from time to time to make, alter or repeal the Bylaws of the Corporation in the manner set forth in the Bylaws from time to time.

2

shares of any other class or classes of stock, or of any other series of the same or any other class or classes of stock, or other securities or property, of the Corporation at such price or prices or at such rates of exchange and with such adjustments; all as may be stated in such resolution or resolutions. Unless otherwise provided in such resolution or resolutions, shares of Series Preferred Stock of such class or series which shall be issued and thereafter acquired by the Corporation through purchase, redemption, exchange, conversion or otherwise shall return to the status of authorized but unissued Series Preferred Stock.

5. Board of Directors of the Corporation .

A. Responsibilities . The business and affairs of the Corporation shall be managed under the direction of the Board of Directors.

B. Number . Subject to the right of the Board of Directors to increase or decrease the number of directors pursuant to this Article 5.B., the Board of Directors shall consist of 22 directors. The Board of Directors may increase or decrease the number of directors by the affirmative vote of (a) three-quarters of the entire Board of Directors if the effective date of such increase or decrease is prior to the date on which Raymond W. Smith ceases to be Chairman of the Corporation (hereinafter referred to as the "Retirement Date"), and (b) a majority of the entire Board of Directors if the effective date of the increase or decrease is on or after the Retirement Date.

C. Elections of Directors . Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

D. Nominations for Directors . Except as otherwise permitted in Article 5.E., only persons who are nominated in accordance with the procedures established in the Bylaws shall be eligible for election as directors.

E. Vacancies . Vacancies and newly created directorships may be filled by the Board of Directors, provided that on or prior to the Retirement Date, such action shall be in accordance with the method for the selection of directors set forth in Section 4.16 of the Bylaws.

6. Bylaws . The Board of Directors is expressly authorized from time to time to make, alter or repeal the Bylaws of the Corporation in the manner set forth in the Bylaws from time to time.

2

### 7. Indemnification.

A. Indemnification of Authorized Representatives in Third Party Proceedings. —The Corporation shall indemnify any person who was or is an authorized representative of the Corporation, and who was or is a party, or is threatened to be made a party to any third party proceeding, by reason of the fact that such person was or is an authorized representative of the Corporation, against expenses, judgments, fines and amounts paid in settlement actually and reasonably incurred by such person in connection with such third party proceeding if such person acted in good faith and in a manner such person reasonably believed to be in, or not opposed to, the best interests of the Corporation and, with respect to any criminal third party proceeding, had no reasonable cause to believe such conduct was unlawful. The termination of any third party proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not of itself create a presumption that the authorized representative did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to, the best interests of the Corporation, or, with respect to any criminal third party proceeding, had reasonable cause to believe that such conduct was unlawful.

B. Indemnification of Authorized Representatives in Corporate Proceedings. —The Corporation shall indemnify any person who was or is an authorized representative of the Corporation and who was or is a party or is threatened to be made a party to any corporate proceeding, by reason of the fact that such person was or is an authorized representative of the Corporation, against expenses actually and reasonably incurred by such person in connection with the defense or settlement of such corporate proceeding if such person acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interests of the Corporation; provided, however, that, except as provided in this Article 7 with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any such person in connection with an action, suit or proceeding (or part thereof) initiated by such person only if the initiation of such action, suit or proceeding (or part thereof) was authorized by the Board of Directors; provided further, however, that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the Corporation unless and only to the extent that the Court of Chancery or the court in which such corporate proceeding was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such authorized representative is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

C. Mandatory Indemnification of Authorized Representatives .—To the extent that an authorized representative or other employee or agent of the Corporation has been successful on the merits or otherwise in defense of any third party or corporate proceeding or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses actually and reasonably incurred by such person in connection therewith.

3

D. Determination of Entitlement to Indemnification. —Any indemnification under section 7(A), (B) or (C) of this Article (unless ordered by a court) shall be made by the Corporation only as authorized in the specific case upon a determination that indemnification of the authorized representative or other employee or agent is proper in the circumstances because such person has either met the applicable standard of conduct set forth in section 7(A) or (B) of this Article or has been successful on the merits or otherwise as set forth in section 7(C) of this Article and that the amount requested has been actually and reasonably incurred. Such determination shall be made:

(1) by the Board of Directors by a majority vote of a quorum consisting of directors who were not parties to such third party or corporate proceeding; or

(2) if such a quorum is not obtainable, or even if obtainable, a quorum of disinterested directors so directs, by independent legal counsel in a written opinion; or

(3) by the stockholders.

E. Advancing Expenses .—Expenses actually and reasonably incurred in defending a third party or corporate proceeding shall be paid on behalf of an authorized representative by the Corporation in advance of the final disposition of such third party or corporate proceeding and within 30 days of receipt by the secretary of the Corporation of (i) an application from such authorized representative setting forth the basis for such indemnification, and (ii) if required by law at the time such application is made, an undertaking by or on behalf of the authorized representative to repay such amount if it shall ultimately be determined that the authorized representative is not entitled to be indemnified by the Corporation as authorized in this Article. The financial ability of any authorized representative to make a repayment contemplated by this section shall not be a prerequisite to the making of an advance. Expenses incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

F. Definitions .—For purposes of this Article:

(1) "authorized representative" shall mean any and all directors and officers of the Corporation and any person designated as an authorized representative by the Board of Directors of the Corporation or any officer of the Corporation to whom the Board has delegated the authority to make such designations (which "authorized representative" may, but need not, include any person serving at the request of the Corporation as a director, officer, employee, trustee or agent of another corporation, partnership, joint venture, trust or other enterprise);

4

(2) "Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under the provisions of this Article with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued;

(3) "corporate proceeding" shall mean any threatened, pending or completed action or suit by or in the right of the Corporation to procure a judgment in its favor and any investigative proceeding by the Corporation;

(4) "criminal third party proceeding" shall include any action or investigation which could or does lead to a criminal third party proceeding;

(5) "expenses" shall include attorneys' fees and disbursements;

(6) "fines" shall include any excise taxes assessed on a person with respect to an employee benefit plan;

(7) actions "not opposed to the best interests of the Corporation" shall include without limitation actions taken in good faith and in a manner the authorized representative reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan;

(8) "other enterprises" shall include employee benefit plans;

(9) "party" shall include the giving of testimony or similar involvement;

(10) "serving at the request of the Corporation" shall include without limitation any service as a director, officer or employee of the Corporation which imposes duties on, or involves services by, such director, officer or employee with respect to an employee benefit plan, its participants, or beneficiaries; and

(11) "third party proceeding" shall mean any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative, other than an action by or in the right of the Corporation.

5

G. Insurance .—The Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against the person and incurred by the person in any such capacity, or arising out of his or her status as such, whether or not the Corporation would have the power or the obligation to indemnify such person against such liability under the provisions of this Article.

H. Scope of Article .—The indemnification of authorized representatives and advancement of expenses, as authorized by the preceding provisions of this Article, shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any agreement, vote of stockholders or disinterested directors or otherwise, both as to action in an official capacity and as to action in another capacity while holding such office. The indemnification and advancement of expenses provided by or granted pursuant to this Article shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be an authorized representative and shall inure to the benefit of the heirs, executors and administrators of such a person.

I. Reliance on Provisions .—Each person who shall act as an authorized representative of the Corporation shall be deemed to be doing so in reliance upon rights of indemnification provided by this Article. Any repeal or modification of the provisions of this Article 7 by the stockholders of the Corporation shall not adversely affect any right or benefit of a director existing at the time of such repeal or modification.

J. Severability .—If this Article 7 or any portion thereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify each authorized representative of the Corporation as to expenses, judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, including, without limitation, a grand jury proceeding and an action, suit or proceeding by or in the right of the Corporation, to the fullest extent permitted by any applicable portion of this Article 7 that shall not have been invalidated, by the GCL or by any other applicable law.

8. Duty of Care . A director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of the GCL, or (iv) for any transaction from which the director derived an improper personal benefit. If the GCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the GCL, as so amended. Any repeal or modification of the provisions of this Article 8 by the stockholders of the Corporation shall not adversely affect any right or benefit of a director of the Corporation existing at the time of such repeal or modification.

6

9. Board Consideration of All Relevant Factors . The Board of Directors of the Corporation, when evaluating any offer of another party to (a) make a tender or exchange offer for any equity security of the Corporation, (b) merge or consolidate the Corporation with another corporation, or (c) purchase or otherwise acquire all or substantially all of the properties and assets of the Corporation, may, in connection with the exercise of its judgment in determining what is in the best interests of the Corporation and its stockholders, give due consideration to (i) all relevant factors, including without limitation the social, legal, environmental and economic effects on employees, customers, suppliers and other affected persons, firms and corporations and on the communities and geographical areas in which the Corporation and its subsidiaries operate or are located and on any of the businesses and properties of the Corporation or any of its subsidiaries, as well as such other factors as the directors deem relevant, and (ii) the consideration being offered, not only in relation to the then current market price for the Corporation's outstanding shares of capital stock, but also in relation to the then current value of the Corporation in a freely negotiated transaction and in relation to the Board of Directors' estimate of the future value of the Corporation (including the unrealized value of its properties and assets) as an independent going concern.

10. Unanimous Consent of Stockholders in Lieu of Meeting . Any action required to be taken at any annual or special meeting of stockholders of the Corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of all of the outstanding stock entitled to vote to take such action at any annual or special meeting of stockholders of the Corporation and shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the books in which proceedings or meetings of stockholders are recorded. Every written consent shall bear the date of signature of each stockholder who signs the consent and no written consent shall be effective to take the corporate action referred to unless, within 60 days of the earliest dated consent delivered in the manner required in this section to the Corporation, written consents signed by the holders of all of the outstanding stock entitled to vote to take such action are delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the Corporation having custody of the books in which proceedings of meetings of stockholders are recorded. Delivery made to a Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested.

11. Amendments . The Corporation reserves the right to amend, alter, change or repeal any provision contained in this certificate of incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

7

EXHIBIT 3b

# VERIZON COMMUNICATIONS INC.

# BYLAWS

## As amended, effective as of September 1, 2005

# B Y L A W S

## OF

## VERIZON COMMUNICATIONS INC.

(a Delaware corporation)

# B Y L A W S
## OF
## VERIZON COMMUNICATIONS INC.

### Table of Contents

**ARTICLE I**
**Offices and Fiscal Year** 1
SECTION 1.01.  *Registered Office* 1
SECTION 1.02.  *Fiscal Year* 1

**ARTICLE II**
**Notice - Waivers - Meetings** 1
SECTION 2.01.  *Notice, What Constitutes* 1
SECTION 2.02.  *Notice of Meetings of Board of Directors* 1
SECTION 2.03.  *Notice of Meetings of Stockholders* 2
SECTION 2.04.  *Waivers of Notice* 2
SECTION 2.05.  *Exception to Requirements of Notice* 2
SECTION 2.06.  *Conference Telephone Meetings* 3

**ARTICLE III**
**Meetings of Stockholders** 3
SECTION 3.01.  *Place of Meeting* 3
SECTION 3.02.  *Annual Meeting* 3
SECTION 3.03.  *Special Meetings* 3
SECTION 3.04.  *Quorum, Manner of Acting and Adjournment* 3
SECTION 3.05.  *Organization* 4
SECTION 3.06.  *Voting* 5
SECTION 3.07.  *Voting Lists* 5
SECTION 3.08.  *Inspectors of Election* 6

**ARTICLE IV**
**Board of Directors** 7
SECTION 4.01.  *Powers* 7
SECTION 4.02.  *Number* 7
SECTION 4.03.  *Term of Office* 7
SECTION 4.04.  *Vacancies* 7
SECTION 4.05.  *Resignations* 7
SECTION 4.06.  *Organization* 8
SECTION 4.07.  *Place of Meeting* 8
SECTION 4.08.  *Regular Meetings* 8
SECTION 4.09.  *Special Meetings* 8
SECTION 4.10.  *Quorum, Manner of Acting and Adjournment* 8
SECTION 4.11.  *Committees of the Board* 8
SECTION 4.12.  *Compensation of Directors* 9

i

| | | |
|---|---|---|
| SECTION 4.13. | *Qualifications and Election of Directors* | 9 |
| SECTION 4.14. | *Voting of Stock* | 10 |
| SECTION 4.15. | *Endorsement of Securities for Transfer* | 10 |

**ARTICLE V**
**Officers** 11

| | | |
|---|---|---|
| SECTION 5.01. | *Number, Qualifications and Designation* | 11 |
| SECTION 5.02. | *Election and Term of Office* | 11 |
| SECTION 5.03. | *Subordinate Officers, Committees and Agents* | 11 |
| SECTION 5.04. | *Officers' Bonds* | 11 |
| SECTION 5.05. | *Salaries* | 11 |

**ARTICLE VI**
**Certificates of Stock, Transfer, Etc.** 11

| | | |
|---|---|---|
| SECTION 6.01. | *Form and Issuance* | 11 |
| SECTION 6.02. | *Transfer* | 12 |
| SECTION 6.03. | *Lost, Stolen, Destroyed or Mutilated Certificates* | 12 |
| SECTION 6.04. | *Record Holder of Shares* | 12 |
| SECTION 6.05. | *Determination of Stockholders of Record* | 13 |

**ARTICLE VII**
**General Provisions** 14

| | | |
|---|---|---|
| SECTION 7.01. | *Dividends* | 14 |
| SECTION 7.02. | *Contracts* | 14 |
| SECTION 7.03. | *Corporate Seal* | 14 |
| SECTION 7.04. | *Checks, Notes, Etc.* | 14 |
| SECTION 7.05. | *Corporate Records* | 14 |
| SECTION 7.06. | *Amendment of Bylaws* | 15 |

ii

# B Y L A W S

## OF

## VERIZON COMMUNICATIONS INC.

(a Delaware corporation)

### ARTICLE I
### Offices and Fiscal Year

SECTION 1.01. **Registered Office.** —The registered office of the corporation shall be in the City of Wilmington, County of New Castle, State of Delaware until a different office is established by resolution of the board of directors and a certificate certifying the change is filed in the manner provided by statute.

SECTION 1.02. **Fiscal Year.** —The fiscal year of the corporation shall end on the 31st day of December in each year.

### ARTICLE II
### Notice - Waivers - Meetings

SECTION 2.01. **Notice, What Constitutes.** —Whenever, under the provisions of the Delaware General Corporation Law ("GCL") or the certificate of incorporation or these Bylaws, notice is required to be given to any director or stockholder, it shall not be construed to require personal notice, but such notice may be given in writing, by mail or by telegram (with messenger service specified), telex or TWX (with answerback received) or courier service, charges prepaid, or by telephone or facsimile transmission to the address (or to the telex, TWX, facsimile or telephone number) of the person appearing on the books of the corporation, or in the case of directors, supplied to the corporation for the purpose of notice. If the notice is sent by mail, telegram or courier service, it shall be deemed to be given when deposited in the United States mail or with a telegraph office or courier service for delivery to that person or, in the case of telex or TWX, when dispatched, or in the case of facsimile transmission, when received.

SECTION 2.02. **Notice of Meetings of Board of Directors.** —Notice of a regular meeting of the board of directors need not be given. Notice of every special meeting of the board of directors shall be given to each director in person or by telephone or in writing at least 24 hours (in the case of notice in person or by telephone, telex, TWX or facsimile transmission) or 48 hours (in the case of notice by telegram, courier service or express mail) or five days (in the case of notice by first class mail) before the time at which the meeting is to be held. Every such notice shall state the time and place of the meeting. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the board need be specified in a notice of the meeting.

1

SECTION 2.03. **Notice of Meetings of Stockholders.** —Written notice of the place, date and hour of every meeting of the stockholders, whether annual or special, shall be given to each stockholder of record entitled to vote at the meeting not less than ten nor more than 60 days before the date of the meeting. Every notice of a special meeting shall state the purpose or purposes thereof. If the notice is sent by mail, it shall be deemed to have been given when deposited in the United States mail, postage prepaid, directed to the stockholder at the address of the stockholder as it appears on the records of the corporation.

SECTION 2.04. **Waivers of Notice.**

(a) **Written Waiver.** —Whenever notice is required to be given under any provisions of the GCL or the certificate of incorporation or these Bylaws, a written waiver, signed by the person or persons entitled to the notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors, or members of a committee of directors need be specified in any written waiver of notice of such meeting.

(b) **Waiver by Attendance.** —Attendance of a person at a meeting, either in person or by proxy, shall constitute a waiver of notice of such meeting, except where a person attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting was not lawfully called or convened.

SECTION 2.05. **Exception to Requirements of Notice.**

(a) **General Rule.** —Whenever notice is required to be given, under any provision of the GCL or the certificate of incorporation or these Bylaws, to any person with whom communication is unlawful, the giving of such notice to such person shall not be required and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such person. Any action or meeting which shall be taken or held without notice to any such person with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.

(b) **Stockholders Without Forwarding Addresses.** —Whenever notice is required to be given, under any provision of the GCL or the certificate of incorporation or these Bylaws, to any stockholder to whom (i) notice of two consecutive annual meetings, and all notices of meetings or of the taking of action by written consent without a meeting to such person during the period between such two consecutive annual meetings, or (ii) all, and at least two, payments (if sent by first class mail) of dividends or interest on securities during a 12 month period, have been mailed addressed to such person at his address as shown on the records of the corporation and have been returned undeliverable, the giving of such notice to such person shall not be required. Any action or meeting which shall be taken or held without notice to such person shall have the same force and effect as if such notice had been duly given. If any such person shall deliver to the corporation a written notice setting forth the person's then current address, the requirement that notice be given to such person shall be reinstated.

2

SECTION 2.06. **Conference Telephone Meetings.** —One or more directors may participate in a meeting of the board, or of a committee of the board, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other. Participation in a meeting pursuant to this section shall constitute presence in person at such meeting.

## ARTICLE III
### Meetings of Stockholders

SECTION 3.01. **Place of Meeting.** —All meetings of the stockholders of the corporation shall be held at such place within or without the State of Delaware as shall be designated by the board of directors in the notice of such meeting (or by the Chairman calling a meeting pursuant to Section 3.03).

SECTION 3.02. **Annual Meeting.** —The board of directors may fix and designate the date and time of the annual meeting of the stockholders. At said meeting the stockholders then entitled to vote shall elect directors and shall transact such other business as may properly be brought before the meeting.

SECTION 3.03. **Special Meetings.** —Special meetings of the stockholders of the corporation may be called at any time by the chairman of the board or a majority of the board of directors. At any time, upon the written request of any person or persons who have duly called a special meeting, which written request shall state the purpose or purposes of the meeting, it shall be the duty of the secretary to fix the date of the meeting which shall be held at such date and time as the secretary may fix, not less than ten nor more than 60 days after the receipt of the request, and to give due notice thereof. If the secretary shall neglect or refuse to fix the time and date of such meeting and give notice thereof, the person or persons calling the meeting may do so.

SECTION 3.04. **Quorum, Manner of Acting and Adjournment.**

(a) **Quorum.** —The holders of a majority of the shares entitled to vote, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders except as otherwise provided by the GCL, by the certificate of incorporation or by these Bylaws. If a quorum is not present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present or represented. At any such adjourned meeting at which a quorum is present or represented, the corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

3

VERIZON COMMUNICATIONS INC (Document Received 02/26/2008 16:49 Page 16 of 108

(b) **Manner of Acting.** —Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy and entitled to vote at the meeting on the election of directors. In all matters other than the election of directors, the affirmative vote of the majority of shares present in person or represented by proxy at the meeting and entitled to vote and voting thereon shall be the act of the stockholders, unless the question is one upon which, by express provision of the applicable statute, the certificate of incorporation or these Bylaws, a different vote is required in which case such express provision shall govern and control the decision of the question. The stockholders present in person or by proxy at a duly organized meeting can continue to do business until adjournment, notwithstanding withdrawal of enough stockholders to leave less than a quorum.

(c) **Stockholder Proposals.** —Nominations by stockholders of persons for election to the board of directors of the corporation may be made at an annual meeting in compliance with Section 4.13 hereof. The proposal of other business to be considered by the stockholders at an annual meeting of stockholders may be made (i) pursuant to the corporation's notice of meeting, (ii) by or at the direction of the board of directors, or (iii) by any stockholder of the corporation pursuant to timely notice in writing to the secretary of the corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the corporation not less than 90 days prior to the anniversary date of the prior year's annual meeting. Such stockholder's notice to the secretary shall set forth (a) as to the stockholder giving notice and the beneficial owner, if any on whose behalf the proposal is made, (i) their name and record address, and (ii) the class and number of shares of capital stock of the corporation which are beneficially owned by each of them, and (b) a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting and any material interest in such business of such stockholder giving notice and the beneficial owner, if any, on whose behalf the proposal is made. Only such business shall be conducted at a special meeting of stockholders as shall have been brought before the meeting pursuant to the corporation's notice of meeting. Only such business shall be conducted at a meeting of stockholders as shall have been brought before the meeting in accordance with the procedures set forth in this section.

(d) The chairman of the meeting may, if the facts warrant, determine and declare to the meeting that any proposal made at the meeting was not made in accordance with the foregoing procedures and, in such event, the proposal shall be disregarded. Any decision by the chairman of the meeting shall be conclusive and binding upon all stockholders of the corporation for any purpose.

SECTION 3.05. **Organization.** —At every meeting of the stockholders, the chairman of the board, if there be one, or in the case of a vacancy in the office or absence of the chairman of the board, one of the following persons present in the order stated: the president, the vice chairman, if one has been appointed, a chairman designated by the board of directors or a chairman chosen by the stockholders entitled to cast a majority of the votes which all stockholders present in person or by proxy are entitled to cast, shall act as chairman, and the secretary, or, in the absence of the secretary, an assistant secretary, or in the absence of the secretary and the assistant secretaries, a person appointed by the chairman, shall act as secretary.

4

SECTION 3.06. **Voting.**

(a) **General Rule.** —Unless otherwise provided in the certificate of incorporation, each stockholder shall be entitled to one vote, in person or by proxy, for each share of capital stock having voting power held by such stockholder.

(b) **Voting and Other Action by Proxy.**

(1) A stockholder may execute a writing authorizing another person or persons to act for the stockholder as proxy. Such execution may be accomplished by the stockholder or the authorized officer, director, employee or agent of the stockholder signing such writing or causing his or her signature to be affixed to such writing by any reasonable means including, but not limited to, by facsimile signature. A stockholder may authorize another person or persons to act for the stockholder as proxy by transmitting or authorizing the transmission of a telegram, cablegram, or other means of electronic transmission to the person who will be the holder of the proxy or to a proxy solicitation firm, proxy support service organization or like agent duly authorized by the person who will be the holder of the proxy to receive such transmission if such telegram, cablegram or other means of electronic transmission sets forth or is submitted with information from which it can be determined that the telegram, cablegram or other electronic transmission was authorized by the stockholder.

(2) No proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period.

(3) A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power. A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.

SECTION 3.07. **Voting Lists.** —The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting. The list shall be arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten days prior to the meeting either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof, and may be inspected by any stockholder who is present.

5

SECTION 3.08. **Inspectors of Election.**

(a) **Appointment.** —All elections of directors shall be by written ballot; the vote upon any other matter need not be by ballot. In advance of any meeting of stockholders the board of directors may appoint one or more inspectors, who need not be stockholders, to act at the meeting and to make a written report thereof. The board of directors may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the person presiding at the meeting shall appoint one or more inspectors to act at the meeting. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the person's best ability.

(b) **Duties.** —The inspectors shall ascertain the number of shares outstanding and the voting power of each, shall determine the shares represented at the meeting and the validity of proxies and ballots, shall count all votes and ballots, shall determine and retain for a reasonable period a record of the disposition of any challenges made to any determination by the inspectors, and shall certify their determination of the number of shares represented at the meeting and their count of all votes and ballots. The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of the duties of the inspectors.

(c) **Polls.** —The date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting shall be announced at the meeting. No ballot, proxies or votes, nor any revocations thereof or changes thereto, shall be accepted by the inspectors after the closing of the polls unless the Court of Chancery upon application by a stockholder shall determine otherwise.

(d) **Reconciliation of Proxies and Ballots.** —In determining the validity and counting of proxies and ballots, the inspectors shall be limited to an examination of the proxies, any envelopes submitted with those proxies, any information transmitted in accordance with section 3.06, ballots and the regular books and records of the corporation, except that the inspectors may consider other reliable information for the limited purpose of reconciling proxies and ballots submitted by or on behalf of banks, brokers, their nominees or similar persons which represent more votes than the holder of a proxy is authorized by the record owner to cast or more votes than the stockholder holds of record. If the inspectors consider other reliable information for the limited purpose permitted herein, the inspectors at the time they make their certification pursuant to subsection (b) shall specify the precise information considered by them including the person or persons from whom they obtained the information, when the information was obtained, the means by which the information was obtained and the basis for the inspectors' belief that such information is accurate and reliable.

6

## ARTICLE IV
## Board of Directors

SECTION 4.01. **Powers.** —All powers vested by law in the corporation shall be exercised by or under the authority of, and the business and affairs of the corporation shall be managed under the direction of, the board of directors.

SECTION 4.02. **Number.** —Subject to the provisions of the certificate of incorporation, the board of directors shall consist of such number of directors as may be determined from time to time by resolution adopted by a vote of a majority of the entire board of directors.

SECTION 4.03. **Term of Office.** —Directors of the corporation shall hold office until the next annual meeting of stockholders and until their successors shall have been elected and qualified, except in the event of death, resignation or removal.

SECTION 4.04. **Vacancies.**

(a) Vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and a director so chosen shall hold office until the next annual election of the class for which such director shall have been elected and until a successor is duly elected and qualified. If there are no directors in office, then an election of directors may be held in the manner provided by statute.

(b) Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the certificate of incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

(c) If, at the time of filling any vacancy or any newly created directorship, the directors then in office shall constitute less than a majority of the entire board (as constituted immediately prior to any such increase), the Court of Chancery may, upon application of any stockholder or stockholders holding at least ten percent of the total number of the shares at the time outstanding having the right to vote for such directors, summarily order an election to be held to fill any such vacancies or newly created directorship, or to replace the directors chosen by the directors then in office.

SECTION 4.05. **Resignations.** —Any director may resign at any time upon written notice to the chairman, president or secretary of the corporation. The resignation shall be effective upon receipt thereof by the corporation or at such subsequent time as shall be specified in the notice of resignation and, unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make it effective.

7

SECTION 4.06. **Organization.** —At every meeting of the board of directors, the chairman of the board, if there be one, or, in the case of a vacancy in the office or absence of the chairman of the board, one of the following officers present in the order stated: the president, the vice chairman, if one has been appointed, the vice presidents in their order of rank and seniority, or a chairman chosen by a majority of the directors present, shall preside, and the secretary, or, in the absence of the secretary, an assistant secretary, or in the absence of the secretary and the assistant secretaries, any person appointed by the chairman of the meeting, shall act as secretary.

SECTION 4.07. **Place of Meeting.** —Meetings of the board of directors, both regular and special, shall be held at such place within or without the State of Delaware as the board of directors may from time to time determine, or as may be designated in the notice of the meeting.

SECTION 4.08. **Regular Meetings.** —Regular meetings of the board of directors shall be held without notice at such time and place as shall be designated from time to time by resolution of the board of directors.

SECTION 4.09. **Special Meetings.** —Special meetings of the board of directors shall be held whenever called by the chairman or by three or more of the directors.

SECTION 4.10. **Quorum, Manner of Acting and Adjournment.**

(a) **General Rule.** —At all meetings of the board one-third of the total number of directors shall constitute a quorum for the transaction of business. The vote of a majority of the directors present at any meeting at which a quorum is present shall be the act of the board of directors, except as may be otherwise specifically provided by the GCL or by the certificate of incorporation. If a quorum is not present at any meeting of the board of directors, the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum is present.

(b) **Unanimous Written Consent.** —Unless otherwise restricted by the certificate of incorporation, any action required or permitted to be taken at any meeting of the board of directors may be taken without a meeting, if all members of the board consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the board.

SECTION 4.11. **Committees of the Board.**

(a) **Establishment.** —The board of directors may, by resolution adopted by a majority of the entire board, establish one or more other committees, each committee to consist of one or more directors. The board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee and the alternate or alternates, if any, designated for such member, the member or members of the committee present at any meeting and not disqualified from voting, whether or not they constitute a quorum, may unanimously appoint another director to act at the meeting in the place of any such absent or disqualified member.

8

(b) **Powers.** —Any such committee, to the extent provided in the resolution establishing such committee, shall have and may exercise all the power and authority of the board of directors in the management of the business and affairs of the corporation and may authorize the seal of the corporation to be affixed to all papers which may require it; but no such committee shall have such power or authority in reference to amending the certificate of incorporation (except that a committee may, to the extent authorized in the resolution or resolutions providing for the issuance of shares of stock adopted by the board of directors as provided in Section 151(a) of the GCL, fix the designation and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of assets of the corporation or the conversion into, or the exchange of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the corporation or fix the number of shares of any series of stock or authorize the increase or decrease of shares of any series), adopting an agreement of merger or consolidation under Section 251, 252, 254, 255, 256, 257, 258, 263, or 264 of the GCL, recommending to the stockholders the sale, lease or exchange of all or substantially all of the corporation's property and assets, recommending to the stockholders a dissolution of the corporation or a revocation of a dissolution, or amending the Bylaws of the corporation. Such committees shall have such name or names as may be determined from time to time by resolution adopted by the board of directors. Each committee so formed shall keep regular minutes of its meetings and report the same to the board of directors when required.

(c) **Committee Procedures.** —The term "board of directors" or "board," when used in any provision of these Bylaws relating to the organization or procedures of or the manner of taking action by the board of directors, shall be construed to include and refer to any committee of the board.

SECTION 4.12. **Compensation of Directors.** —Unless otherwise restricted by the certificate of incorporation, the board of directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the board of directors and may be paid a fixed sum for attendance at each meeting of the board of directors or a stated salary as director. No such payment shall preclude any director from serving the corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

SECTION 4.13. **Qualifications and Election of Directors.**

(a) All directors of the corporation shall be natural persons of full age, but need not be residents of Delaware or stockholders of the corporation. Except in the case of vacancies, directors shall be elected by the stockholders. If directors of more than one class are to be elected, each class of directors to be elected at the meeting shall be nominated and elected separately. A director shall retire from the board at the board meeting next following his or her 72 [nd] birthday. The term of office of any director elected or appointed in conformity with the preceding sentence shall continue (to the extent provided in the certificate of incorporation and these Bylaws) after such director reaches 72 years of age.

(b) Nominations of persons for election to the board of directors of the corporation may be made at a meeting of stockholders by or at the direction of the board of directors.

9

(c) Nominations of persons for election to the board of directors of the corporation may also be made at the meeting by any stockholder of the corporation entitled to vote for the election of directors who complies with the notice procedures set forth in this Section 4.13 (c) and (d). Such nominations, other than those made by or at the direction of the board, shall be made pursuant to timely notice in writing to the secretary of the corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the corporation not less than 90 days prior to the anniversary date of the prior year's meeting for the election of directors. Such stockholder's notice to the secretary shall set forth (a) as to each person whom the stockholder proposes to nominate for election or re-election as a director, (i) the name, age, business address and residence address of the person, (ii) the principal occupation or employment of the person, (iii) the class and number of shares of capital stock of the corporation which are beneficially owned by the person, and (iv) any other information relating to the person that is required to be disclosed in solicitations for proxies for election of directors pursuant to the rules and regulations promulgated under the Securities Exchange Act of 1934 as amended; and (b) as to the stockholder giving the notice (i) the name and record address of the stockholder and (ii) the class and number of shares of capital stock of the corporation which are beneficially owned by the stockholder. The corporation may require any proposed nominee to furnish such other information as may reasonably be required by the corporation to determine the eligibility of such proposed nominee to serve as a director of the corporation. No person shall be eligible for election as a director by the stockholders of the corporation unless nominated in accordance with the procedures set forth herein.

(d) The chairman of the meeting may, if the facts warrant, determine and declare to the meeting that any nomination made at the meeting was not made in accordance with the foregoing procedures and, in such event, the nomination shall be disregarded. Any decision by the chairman of the meeting shall be conclusive and binding upon all stockholders of the corporation for any purpose.

SECTION 4.14. **Voting of Stock.** —Unless otherwise ordered by the board of directors, each of the chairman of the board, the president, and the principal accounting officer (as identified in the corporation's most recent report filed with the United States Securities and Exchange Commission) shall have full power and authority, on behalf of the corporation, to attend and to act and vote, in person or by proxy, at any meeting of the stockholders of any company in which the corporation may hold stock, and at any such meeting shall possess and may exercise any and all of the rights and powers incident to the ownership of such stock which, as the owner thereof, the corporation might have possessed and exercised if present. The board of directors, by resolution adopted from time to time, may confer like powers upon any other person or persons.

SECTION 4.15. **Endorsement of Securities for Transfer.** —Each of the chairman of the board, the president, and the principal accounting officer shall have the power to endorse and deliver for sale, assignment or transfer certificates for stock, bonds or other securities, registered in the name of or belonging to the corporation, whether issued by the corporation or by any other corporation, government, state or municipality or agency thereof; and the board of directors from time to time may confer like power upon any other officer, agent or person by resolution adopted from time to time. Every such endorsement shall be countersigned by the treasurer or an assistant treasurer.

10

## ARTICLE V
### Officers

SECTION 5.01. **Number, Qualifications and Designation.** —The corporation shall have such officers with such titles and duties as shall be specified by resolution of the board of directors. Any number of offices may be held by the same person. Officers may, but need not, be directors or stockholders of the corporation. The board of directors may elect from among the members of the board a chairman of the board and one or more vice chairmen of the board.

SECTION 5.02. **Election and Term of Office.** —The officers of the corporation, except those elected by delegated authority pursuant to section 5.03 of this Article, shall be elected annually by the board of directors, and each such officer shall hold office for a term of one year and until a successor is elected and qualified, or until his or her earlier resignation or removal. Any officer may resign at any time upon written notice to the corporation.

SECTION 5.03. **Subordinate Officers, Committees and Agents.** —Each officer of the corporation shall have the power to appoint subordinate officers (including without limitation one or more assistant secretaries and one or more assistant treasurers) and to retain or appoint employees or other agents, or committees thereof, and to prescribe the authority and duties of such subordinate officers, committees, employees or other agents.

SECTION 5.04. **Officers' Bonds.** —No officer of the corporation need provide a bond to guarantee the faithful discharge of the officer's duties unless the board of directors shall by resolution so require a bond in which event such officer shall give the corporation a bond (which shall be renewed if and as required) in such sum and with such surety or sureties as shall be satisfactory to the board of directors for the faithful performance of the duties of office.

SECTION 5.05. **Salaries.** —The salaries of the officers and agents of the corporation elected by the board of directors shall be fixed from time to time by the board of directors.

## ARTICLE VI
### Certificates of Stock, Transfer, Etc.

SECTION 6.01. **Form and Issuance.**

(a) **Issuance.** —The shares of the corporation shall be represented by certificates unless the board of directors shall by resolution provide that some or all of any class or series of stock shall be uncertificated shares. Any such resolution shall not apply to shares represented by a certificate until the certificate is surrendered to the corporation. Notwithstanding the adoption of any resolution providing for uncertificated shares, every holder of stock represented by certificates and upon request every holder of uncertificated shares shall be entitled to have a certificate signed by, or in the name of the corporation by, the chairman or vice chairman of the board of directors, or the president or vice president, and by the treasurer or an assistant treasurer, or the secretary or an assistant secretary, representing the number of shares registered in certificate form.

11

Case 3:06-cv-00475-TJW    Document 11    Filed 02/26/2007    Page 24 of 55

(b) **Form and Records.** —Stock certificates of the corporation shall be in such form as approved by the board of directors. The stock record books and the blank stock certificate books shall be kept by the secretary or by any agency designated by the board of directors for that purpose. The stock certificates of the corporation shall be numbered and registered in the stock ledger and transfer books of the corporation as they are issued.

(c) **Signatures.** —Any of or all the signatures upon the stock certificates of the corporation may be a facsimile. In case any officer, transfer agent or registrar who has signed, or whose facsimile signature has been placed upon, any share certificate shall have ceased to be such officer, transfer agent or registrar before the certificate is issued, it may be issued with the same effect as if the signatory were such officer, transfer agent or registrar at the date of its issue.

SECTION 6.02. **Transfer.** —Transfers of shares shall be made on the share register or transfer books of the corporation upon surrender of the certificate therefor, endorsed by the person named in the certificate or by an attorney lawfully constituted in writing. No transfer shall be made which would be inconsistent with the provisions of applicable law.

SECTION 6.03. **Lost, Stolen, Destroyed or Mutilated Certificates.** —The board of directors may direct a new certificate of stock or uncertificated shares to be issued in place of any certificate theretofore issued by the corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new certificate or certificates, the board of directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or the legal representative of the owner, to give the corporation a bond sufficient to indemnify against any claim that may be made against the corporation on account of the alleged loss, theft or destruction of such certificate or the issuance of such new certificate or uncertificated shares.

SECTION 6.04. **Record Holder of Shares.** —The corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends, and to vote as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Delaware.

12

SECTION 6.05. **Determination of Stockholders of Record.**

(a) **Meetings of Stockholders.** —In order that the corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which record date shall not be more than 60 nor less than ten days before the date of such meeting. If no record date is fixed by the board of directors, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting unless the board of directors fixes a new record date for the adjourned meeting.

(b) **Consent of Stockholders.** —In order that the corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the board of directors, and which date shall not be more than ten days after the date upon which the resolution fixing the record date is adopted by the board of directors. If no record date has been fixed by the board of directors, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the board of directors is required by the GCL, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the corporation by delivery to its registered office in Delaware, its principal place of business, or an officer or agent of the corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to a corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the board of directors and prior action by the board of directors is required by the GCL, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at the close of business on the day on which the board of directors adopts the resolution taking such prior action.

(c) **Dividends.** —In order that the corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights of the stockholders entitled to exercise any rights in respect of any change, conversion or exchange of stock, or for the purpose of any other lawful action, the board of directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted, and which record date shall be not more than 60 days prior to such action. If no record date is fixed, the record date for determining stockholders for any such purpose shall be at the close of business on the day on which the board of directors adopts the resolution relating thereto.

13

## ARTICLE VII
### General Provisions

SECTION 7.01. **Dividends.** —Subject to the restrictions contained in the GCL and any restrictions contained in the certificate of incorporation, the board of directors may declare and pay dividends upon the shares of capital stock of the corporation.

SECTION 7.02. **Contracts.** —Except as otherwise provided in these Bylaws, the board of directors may authorize any officer or officers including the chairman and vice chairman of the board of directors, or any agent or agents, to enter into any contract or to execute or deliver any instrument on behalf of the corporation and such authority may be general or confined to specific instances. Any officer so authorized may, unless the authorizing resolution otherwise provides, delegate such authority to one or more subordinate officers, employees or agents, and such delegation may provide for further delegation.

SECTION 7.03. **Corporate Seal.** —The corporation shall have a corporate seal, which shall have inscribed thereon the name of the corporation, the year of its organization and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

SECTION 7.04. **Checks, Notes, Etc.** —All checks, notes and evidences of indebtedness of the corporation shall be signed by such person or persons as the board of directors may from time to time designate.

SECTION 7.05. **Corporate Records.**

(a) **Examination by Stockholders.** —Every stockholder shall, upon written demand under oath stating the purpose thereof, have a right to examine, in person or by agent or attorney, during the usual hours for business, for any proper purpose, the stock ledger, list of stockholders, books or records of account, and records of the proceedings of the stockholders and directors of the corporation, and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent shall be the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing which authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the corporation at its registered office in Delaware or at its principal place of business. Where the stockholder seeks to inspect the books and records of the corporation, other than its stock ledger or list of stockholders, the stockholder shall first establish (1) that the stockholder has complied with the provisions of this section respecting the form and manner of making demand for inspection of such documents; and (2) that the inspection sought is for a proper purpose. Where the stockholder seeks to inspect the stock ledger or list of stockholders of the corporation and has complied with the provisions of this section respecting the form and manner of making demand for inspection of such documents, the burden of proof shall be upon the corporation to establish that the inspection sought is for an improper purpose.

14

(b) **Examination by Directors.** —Any director shall have the right to examine the corporation's stock ledger, a list of its stockholders and its other books and records for a purpose reasonably related to the person's position as a director.

SECTION 7.06. **Amendment of Bylaws.** —Except as otherwise provided herein, these Bylaws may be altered, amended or repealed or new Bylaws may be adopted either (1) by vote of the stockholders at a duly organized annual or special meeting of stockholders in accordance with the certificate of incorporation, or (2) by vote of a majority of the entire board of directors at any regular or special meeting of directors if such power is conferred upon the board of directors by the certificate of incorporation.

15

EXHIBIT 10j(i)

### VERIZON COMMUNICATIONS INC. LONG-TERM INCENTIVE PLAN
### PERFORMANCE STOCK UNIT AGREEMENT
### 2003-05 AWARD CYCLE

AGREEMENT between Verizon Communications Inc. ("Verizon") and the participant identified on the attached signature page (the "Participant").

1. *Purpose of Agreement.* The purpose of this Agreement is to provide a one-time grant of performance stock units ("PSUs") to the Participant.

2. *Agreement .* This Agreement is entered into pursuant to the terms of the 2001 Verizon Communications Inc. Long-Term Incentive Plan (the "Plan"), and evidences the grant of a performance stock award in the form of PSUs pursuant to the Plan. This Agreement is designed to comply with the requirements of Section 162(m) of the Code and the Treasury Department Regulations thereunder. The PSUs and this Agreement are subject to the terms and provisions of the Plan. (The Participant may request a copy of the Plan from the Verizon Compensation and Executive Benefits Department.) By executing this Agreement, the Participant agrees to be bound by the terms and provisions of the Plan, and by the actions of the Plan Administrator, the Human Resources Committee of Verizon's Board of Directors or any successor thereto (the "Committee"), and any designee of the Committee.

3. *Contingency.* The grant of PSUs is contingent on the Participant's timely execution of this Agreement and satisfaction of certain other conditions contained herein. If the Participant does not execute this Agreement and return it as provided on the attached signature page within 30 business days of its receipt, the Participant shall not be entitled to the PSUs.

4. *Number of Units .* The Participant is granted the number of PSUs specified on the attached signature page as of February 3, 2003. A PSU is a hypothetical share of Verizon's common stock. The value of a PSU on any given date shall be equal to the closing price of Verizon's common stock as of such date. A PSU does not represent an equity interest in Verizon and carries no voting rights. A Dividend Equivalent Unit ("DEU") or fraction thereof shall be added to each PSU each time that a dividend is paid on Verizon's common stock. The amount of each DEU shall be equal to the dividend paid on a share of Verizon's common stock. The DEU shall be converted into PSUs or fractions thereof based upon the average of the high and low sales prices of Verizon's common stock traded on the New York Stock Exchange on the dividend payment date of each declared dividend on Verizon's common stock, and such PSUs or fractions thereof shall be added to the Participant's PSU balance.

---

Performance Stock Unit Agreement (2003-05)                                        Page 1

5. *Vesting.*

    (a) The Participant shall vest in the PSUs to the extent provided in paragraph 5(b) ("Performance Requirement") only if the Participant satisfies the requirements of paragraph 5(c) ("Three-Year Continuous Employment Requirement"), except as otherwise provided in paragraph 7 ("Early Cancellation/Accelerated Vesting of PSUs").

    (b) *Performance Requirement.*

    (1) The PSUs shall vest based on the average annual total shareholder return ("TSR") of Verizon's Common Stock during the three-year period beginning January 1, 2003, and ending December 31, 2005, relative to the combined weighted average annual TSR of the companies in the Standard & Poor's 500 ("S&P 500") Index and the companies in the Telecom Peer Company ("TPC") Index during the same three-year period as provided in the following table—

| Relative TSR Position | Vested Percentage of PSUs * |
|---|---|
| Below 20% | 0% |
| 20% | 40% |
| 30% | 60% |
| 40% | 80% |
| 50% | 100% |
| 60% | 120% |
| 70% | 140% |
| 80% or more | 200% |

*For amounts between 20% and 80%, the vested percentage of PSUs shall equal twice the Relative TSR Position ( *e.g.,* a Relative TSR Position of 52% equals a 104% vested percentage). However, the Committee's discretion to administer the Plan includes the absolute discretion to reduce the vested percentage of PSUs at any Relative TSR Position, and the Committee's exercise of this discretion shall be final, conclusive and binding. <u>Note</u> : No PSUs shall vest if the Relative TSR Position is less than 20% and the maximum percentage of PSUs to vest shall be 200%.

    (2) For purposes of the table set forth in paragraph 5(b)(1)—

    (i) "Relative TSR Position" shall equal (A) 60% of the average annual Verizon S&P 500 TSR Position during the Award Cycle, plus (B) 40% of the average annual Verizon TPC TSR Position during the Award Cycle. The Committee's discretion to

---

Performance Stock Unit Agreement (2003-05)          Page 2

administer the Plan includes the absolute discretion to substitute or eliminate companies in the Telecom Peer Index and determine the Relative TSR Position for any period, and the Committee's exercise of this discretion shall be final, conclusive and binding.

(ii) "Verizon S&P 500 TSR Position" shall be, as determined by the Committee, Verizon's rank among companies in the S&P 500 Index in terms of TSR, expressed as a percentage equal to the number of companies in the S&P 500 Index with a TSR less than or equal to that of Verizon divided by the total number of companies in such index.

(iii) "Verizon TPC TSR Position" shall be, as determined by the Committee, where Verizon would rank among companies in the Telecom Peer Company Index in terms of TSR if Verizon were included in such index, expressed as a percentage equal to the number of companies in the TPC Index with a TSR less than or equal to that of Verizon divided by the total number of companies in such index.

(iv) "TSR" or "Total Shareholder Return" shall mean the change in the price of a share of common stock from the beginning of a period (as measured by the closing price of a share of such stock on the last trading day preceding the beginning of the period) until the end of such period (as measured by the closing price of a share of such stock on the last trading day of the period), adjusted to reflect the reinvestment of dividends (if any) through the purchase of common stock and as may be necessary to take into account stock splits or other events similar to those described in Section 4.3 of the Plan.

(v) "Award Cycle" shall mean the three-year period beginning on January 1, 2003 and ending at the close of business on December 31, 2005.

(c) *Three-Year Continuous Employment Requirement.* Except as otherwise determined by the Committee, the PSUs shall vest only if the Participant is continuously employed by Verizon from the date the PSUs are granted through the end of the Award Cycle.

(d) *Transfer.* Transfer of employment from Verizon to a Related Company (as defined in paragraph 13), from a Related Company to Verizon, or from one Related Company to another Related Company shall not constitute a separation from employment hereunder, and service with a Related Company shall be treated as service with Verizon for purposes of the three-year continuous employment requirement in paragraph 5(c).

6. *Payment* . All payments under this Agreement shall be made in shares of Verizon's Common Stock, except for any fractional shares, which shall be paid in cash. As soon as practicable after the end of the Award Cycle, except as described in paragraph 7(c), the value of the PSUs (minus any withholding for income taxes) shall be paid to the Participant (subject, however, to any deferral application that the Participant has made under the deferral plan then available to the Participant and under procedures adopted by the Plan Administrator). If the Participant dies before any payment due hereunder is made, such payment shall be made to the Participant's beneficiary. Once a payment has been made with respect to a PSU, the PSU shall be canceled.

7. *Early Cancellation/Accelerated Vesting of PSUs.* Subject to the provisions of paragraph 7(c), PSUs may vest or be forfeited before vesting in accordance with paragraph 5 as follows:

(a) *Voluntary Separation and Discharge for Cause.*

(1) If the Participant is not eligible to Retire (as defined in paragraph 7(b)(5)) and quits, if the Participant is terminated for Cause (as defined below), or if the Participant separates from employment under circumstances not described in paragraph 7(b), all then-unvested PSUs shall be canceled immediately and shall not be payable.

(2) For purposes of this Agreement, "Cause" means (i) grossly incompetent performance or substantial or continuing inattention to or neglect of the duties and responsibilities assigned to the Participant; fraud, misappropriation or embezzlement involving the Company; or a material breach of the Code of Business Conduct or any provision incorporated in Exhibit A ("Covenants") to this Agreement, all as determined by the Plan Administrator in its discretion, or (ii) commission of any felony of which the Participant is finally adjudged guilty by a court of competent jurisdiction.

(b) *Retirement, Involuntary Termination Without Cause, Death or Disability.*

(1) This paragraph 7(b) shall apply if, on or before the last day of the Award Cycle, the Participant—

(i) Retires, or

(ii) separates from employment by reason of an involuntary termination without Cause (as determined by the Plan Administrator), death or disability.

(2) Subject to paragraph 7(b)(3), if the Participant separates from employment under circumstances described in paragraph 7(b)(1), the Participant's then-unvested PSUs shall be subject to the vesting

---

Performance Stock Unit Agreement (2003-05)

Page 4

provisions set forth in paragraph 5(a), except that the three-year continuous employment requirement set forth in paragraph 5(c) shall not apply, provided that the Participant executes a release satisfactory to the Company waiving any claims he may have against the Company.

(3) The Participant shall vest under this paragraph 7(b) only in a percentage of the PSUs that would otherwise have vested based upon the ratio of (i) the number of months the Participant was actively at work during the Award Cycle to (ii) the total number of months in the Award Cycle. For this purpose, a Participant who is actively at work through and including the 15 th day of any month shall receive credit for the full month, and a Participant who is not actively at work through and including the 15 th day of the month shall not receive any credit for that month.

(4) Any PSUs that vest pursuant to this paragraph 7(b)(3) shall be payable as soon as practicable after the end of the Award Cycle, except as described in paragraph 7(c). However, the Plan Administrator's discretion to administer the Plan includes the absolute discretion to determine whether and the extent to which the Participant is eligible to receive DEUs with respect to dividends declared after the Participant's separation from employment, and the Plan Administrator's exercise of this discretion shall be final, conclusive and binding.

(5) For purposes of this Agreement, "Retire" means (i) to retire after having attained at least 15 years of Net Credited Service (as defined under the Verizon Management Pension Plan) and a combination of age and years of Net Credited Service that equals or exceeds 75 points, or (ii) retirement under any other circumstances determined in writing by the Plan Administrator.

(c) *Change in Control* . Upon the occurrence of a Change in Control (as defined in the Plan) on or before the last day of the Award Cycle, all then-unvested PSUs shall vest and be payable immediately (without prorating of the award) at 50% of the maximum award payout without regard to the performance requirement in paragraph 5(b) or the three-year continuous employment requirement in paragraph 5(c); provided, however, that if the Participant terminates employment before the Change in Control occurs under the circumstances described in paragraph 7(b)(3), the immediately payable award described in this sentence shall be prorated as described in paragraph 7(b)(3). A Change in Control that occurs after the end of the Award Cycle shall have no effect on whether any PSUs vest or become payable. A Participant who receives the immediate award payment provided in this paragraph 7(c) shall be entitled to receive payment for all dividends declared before the Change in Control, even if such dividends are paid or payable after the Change in Control.

---

(d) *Vesting Schedule.* Except as provided in paragraphs 7(b) and (3), nothing in this paragraph 7 shall alter the vesting schedule prescribed by paragraph 5.

8. *Shareholder Rights.* The Participant shall have no rights as a shareholder with respect to shares of common stock to which this grant relates until the date on which the Participant becomes the holder of record of such shares. Except as provided in the Plan or in this Agreement, no adjustment shall be made for dividends or other rights for which the record date is prior to such date.

9. *Revocation or Amendment of Agreement .* Except to the extent required by law or specifically contemplated under this Agreement (including, but not limited to, the determination of Relative TSR Position, Verizon S&P 500 TSR Position, and Verizon TPC TSR Position, and whether the Participant has been terminated for Cause, has a disability, or has satisfied the three-year continuous employment requirement), the Committee may not, without the written consent of the Participant, (a) revoke this Agreement insofar as it relates to the PSUs granted hereunder, or (b) make or change any determination or change any term, condition or provision affecting the PSUs if the determination or change would materially and adversely affect the PSUs or the Participant's rights thereto. Nothing in the preceding sentence shall preclude the Committee from exercising reasonable administrative discretion with respect to the Plan or this Agreement.

10. *Assignment.* The PSUs shall not be assignable or transferable except by will or by the laws of descent and distribution. During the Participant's lifetime, the PSUs may be deferred only by the Participant or by the Participant's guardian or legal representative.

11. *Beneficiary.* The Participant shall designate a beneficiary in writing and in such manner as is acceptable to the Plan Administrator. If the Participant fails to so designate a beneficiary, or if no such designated beneficiary survives the Participant, the Participant's beneficiary shall be the Participant's estate.

12. *Other Plans and Agreements.* Any gain realized by the Participant pursuant to this Agreement shall not be taken into account as compensation in the determination of the Participant's benefits under any pension, savings, group insurance, or other benefit plan maintained by Verizon or a Related Company, except as determined by the board of directors of such company. The Participant acknowledges that receipt of this Agreement or any prior PSU agreement shall not entitle the Participant to any other benefits under the Plan or any other plans maintained by the Company.

13. *Company and Related Company.* For purposes of this Agreement, "Company" means Verizon and Related Companies. "Related Company" means (a) any

---

Performance Stock Unit Agreement (2003-05)            Page 6

corporation, partnership, joint venture, or other entity in which Verizon hold a direct or indirect ownership or proprietary interest of 50 percent or more, or (b) any corporation, partnership, joint venture, or other entity in which Verizon holds an ownership or other proprietary interest of less than 50 percent but which, in the discretion of the Committee, is treated as a Related Company for purposes of this Agreement.

14. *Employment Status.* The grant of the PSUs shall not be deemed to constitute a contract of employment between the Company and the Participant, nor shall it constitute a right to remain in the employ of any such company.

15. *Taxes.* It shall be a condition to the issuance or delivery of shares of common stock as to which the PSUs relate that provisions satisfactory to the Company shall have been made for payment of any taxes determined by the Company to be required to be paid or withheld pursuant to any applicable law or regulation. The Participant shall be responsible for any income taxes and the employee portion of any employment taxes that arise in connection with this grant of PSUs.

16. *Securities Laws.* The Company shall not be required to issue or deliver any shares of common stock prior to the admission of such shares to listing on any stock exchange on which the stock may then be listed and the completion of any registration or qualification of such shares under any federal or state law or rulings or regulations of any government body that the Company, in its sole discretion, determines to be necessary or advisable.

17. *Committee Authority.* The Committee shall have complete discretion in the exercise of its rights, powers, and duties under this Agreement. Any interpretation or construction of any provision of, and the determination of any question arising under, this Agreement shall be made by the Committee in its sole discretion and shall be final, conclusive, and binding. The Committee may designate any individual or individuals to perform any of its functions hereunder.

18. *Successors.* This Agreement shall be binding upon, and inure to the benefit of, any successor or successors of the Company and the person or entity to whom the PSUs may have been transferred by will, the laws of descent and distribution, or beneficiary designation. All terms and conditions of this Agreement imposed upon the Participant shall, unless the context clearly indicates otherwise, be deemed, in the event of the Participant's death, to refer to and be binding upon such last-mentioned person or entity.

19. *Construction.* This Agreement is intended to grant the PSUs upon the terms and conditions authorized by the Plan. Any provisions of this Agreement that cannot be so administered, interpreted, or construed shall be disregarded. In the event that any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be considered separate and apart from the remainder of this Agreement, which shall remain in full force and effect. In the event that any provision is held to be unenforceable for being unduly broad as written, such provision shall be deemed amended to narrow its application to the extent necessary to make the provision enforceable according to applicable law and shall be enforced as amended.

20. *Defined Terms.* Except where the context clearly indicates otherwise, all capitalized terms used herein shall have the definitions ascribed to them by the Plan, and the terms of the Plan shall apply where appropriate.

21. *Execution of Agreement.* The Participant shall indicate consent to the terms of this Agreement and the Plan by executing the attached signature page which is made a part of this Agreement and otherwise complying with the requirements of paragraph 3.

22. *Confidentiality.* Except to the extent otherwise required by law, the Participant shall not disclose, in whole or in part any of the terms of this Agreement. This paragraph 22 does not prevent the Participant from disclosing the terms of this Agreement to the Participant's spouse or to the Participant's legal, tax, or financial adviser, provided that the Participant take all reasonable measures to assure that he or she does not disclose the terms of this Agreement to a third party except as otherwise required by law.

23. *Additional Remedies.* In addition to any other rights or remedies, whether legal, equitable, or otherwise, that each of the parties to this Agreement may have (including the right of the Company to terminate the Participant for Cause), the Participant acknowledges that—

(a) The covenants incorporated in Exhibit A to this Agreement are essential to the continued good will and profitability of the Company;

(b) The Participant has broad-based skills that will serve as the basis for employment opportunities that are not prohibited by the covenants incorporated in Exhibit A;

(c) When the Participant's employment with the Company terminates, the Participant shall be able to earn a livelihood without violating any of the covenants incorporated in Exhibit A;

(d) Irreparable damage to the Company shall result in the event that the covenants incorporated in Exhibit A are not specifically enforced and that monetary damages will not adequately protect the Company from a breach of these covenants;

(e) If any dispute arises concerning the violation by the Participant of the covenants incorporated in Exhibit A, an injunction may be issued restraining such violation pending the determination of such controversy, and no bond or other security shall be required in connection therewith;

---

Performance Stock Unit Agreement (2003-05)                                                     Page 8

(f) Such covenants shall continue to apply after any expiration, termination, or cancellation of this Agreement; and

(g) The Participant's breach of any of such covenants shall result in the Participant's immediate forfeiture of all rights and benefits under this Agreement.

Performance Stock Unit Agreement (2003-05)                                                                    Page 9

## SIGNATURE PAGE

By executing this page, the undersigned Participant agrees to be bound by the terms of the 2001 Verizon Communications Inc. Long-Term Incentive Plan and the Performance Stock Unit Agreement (2003-05 Award Cycle), the terms of which are incorporated herein by reference, in connection with the following grant to the Participant under the Plan:

| | |
|---|---|
| **NAME OF PARTICIPANT:** | |
| **SOCIAL SECURITY NUMBER:** | |
| **NUMBER OF PSUs:** | |

IN WITNESS WHEREOF, Verizon Communications Inc., by its duly authorized Officer, and the Participant have executed this Agreement.

VERIZON COMMUNICATIONS INC.

By: _____
    Ezra D. Singer
    Executive Vice President -
    Human Resources

_____
Participant

_____
Date

*Please indicate your acceptance by signing above and returning the signed Agreement to the Compensation and Executive Benefits Department at 1095 Avenue of the Americas, 34th Floor, New York, New York 10036 within thirty business days of your receipt of this Agreement.*

Attachment: Exhibit A - Covenant

Performance Stock Unit Agreement (2003-05)                                 Page 10

| Exhibit A—Covenants |
| --- |

**1. Noncompetition** — In consideration for the benefits described in the Agreement to which this Exhibit A is attached, you, the Participant, agree that:

(a) **Prohibited Conduct** — During the period of your employment with the Company, and for the period ending six months after your termination of employment for any reason from the Company, you shall not, without the prior written consent of the Plan Administrator:

(1) personally engage in Competitive Activities (as defined below); or

(2) work for, own, manage, operate, control, or participate in the ownership, management, operation, or control of, or provide consulting or advisory services to, any individual, partnership, firm, corporation, or institution engaged in Competitive Activities, or any company or person affiliated with such person or entity engaged in Competitive Activities; provided that your purchase or holding, for investment purposes, of securities of a publicly traded company shall not constitute "ownership" or "participation in ownership" for purposes of this paragraph so long as your equity interest in any such company is less than a controlling interest;

provided that this paragraph (a) shall not prohibit you from (i) being employed by, or providing services to, a consulting firm, provided that you do not personally engage in Competitive Activities or provide consulting or advisory services to any individual, partnership, firm, corporation, or institution engaged in Competitive Activities, or any company or person affiliated with such person or entity engaged in Competitive Activities, or (ii) engaging in the private practice of law as a sole practitioner or as a partner in (or as an employee of or counsel to) a law firm in accordance with applicable legal and professional standards.

(b) **Competitive Activities** — For purposes of the Agreement to which this Exhibit A is attached, "Competitive Activities" means business activities relating to products or services of the same or similar type as the products or services (1) which are sold (or, pursuant to an existing business plan, will be sold) to paying customers of the Company, and (2) for which you then have responsibility to plan, develop, manage, market, oversee or perform, or had any such responsibility within your most recent 24 months of employment with the Company. Notwithstanding the previous sentence, a business activity shall not be treated as a Competitive Activity if the geographic marketing area of the relevant products or services sold by you or a third party does not overlap with the geographic marketing area for the applicable products and services of the Company.

**2. Interference With Business Relations** — During the period of your employment with the Company, and for a period ending with the expiration of twelve (12) months following your termination of employment for any reason from the Company, you shall not, without the written consent of the Plan Administrator:

(a) recruit or solicit any employee of the Company for employment or for retention as a consultant or service provider;

(b) hire or participate (with another company or third party) in the process of hiring (other than for the Company) any person who is then an employee of the Company, or provide names or other information about Company employees to any person, entity or business (other than the Company) under circumstances that could lead to the use of any such information for purposes of recruiting or hiring;

(c) interfere with the relationship of the Company with any of its employees, agents, or representatives;

(d) solicit or induce, or in any manner attempt to solicit or induce, any client, customer, or prospect of the Company (1) to cease being, or not to become, a customer of the Company or (2) to divert any business of such customer or prospect from the Company; or

(e) otherwise interfere with, disrupt, or attempt to interfere with or disrupt, the relationship, contractual or otherwise, between the Company and any of its customers, clients, prospects, suppliers, consultants, or employees.

**3. Return Of Property; Intellectual Property Rights** — You agree that on or before your termination of employment for any reason with the Company, you shall return to the Company all property owned by the Company or in which the Company has an interest, including files, documents, data and records (whether on paper or in tapes, disks, or other machine-readable form), office equipment, credit cards, and employee identification cards. You acknowledge that the Company is the rightful owner of any programs, ideas, inventions, discoveries, patented or copyrighted material, or trademarks that you may have originated or developed, or assisted in originating or developing, during your period of employment with the Company, where any such origination or development involved the use of Company time, information or resources, or the exercise of your responsibilities for or on behalf of the Company. You shall at all times, both before and after termination of employment, cooperate with the Company in executing and delivering documents requested by the Company, and taking any other actions, that are necessary or requested by the Company to assist the Company in patenting, copyrighting, protecting, enforcing or registering any programs, ideas, inventions, discoveries, works of authorship, data, information, patented or copyrighted material, or trademarks, and to vest title thereto solely in the Company.

**4. Proprietary And Confidential Information** — You shall at all times preserve the confidentiality of all Proprietary Information (defined below) and trade secrets of the Company, except and to the extent that disclosure of such information is legally required. "Proprietary information" means information or data related to the Company, including information entrusted to the Company by others, which has not been fully disclosed to the public by the Company and which is treated as confidential or protected within the business of the Company or is of value to competitors, such as strategic or tactical business plans; undisclosed financial data; ideas, processes, methods, techniques, systems, non-public information, models, devices, programs, computer software, or related information; documents relating to regulatory matters and correspondence with governmental entities; undisclosed information concerning any past, pending, or threatened legal dispute; pricing and cost data; reports and analyses of business prospects; business transactions that are contemplated or planned; research data; personnel information and data; identities of users and purchasers of the Company's products or services; and other confidential matters pertaining to or known by the Company, including confidential information of a third party that you know or should know the Company is obligated to protect.

**5. Definitions** — Except where clearly provided to the contrary, all capitalized terms used in this Exhibit A shall have the definitions given to those terms in the Agreement to which this Exhibit A is attached.

**6. Agreement to Covenants.** You shall indicate your agreement to these Covenants in accordance with the instructions provided. You and Verizon hereby expressly agree that the use of electronic media to indicate confirmation, consent, signature, acceptance, agreement and delivery shall be legally valid and have the same legal force and effect as if you and Verizon executed these Covenants in paper form.

---

Performance Stock Unit Agreement (2003-05)                                                      Exhibit A

EXHIBIT 10j(ii)

## VERIZON COMMUNICATIONS INC. LONG-TERM INCENTIVE PLAN
## PERFORMANCE STOCK UNIT AGREEMENT
## 2004–06 AWARD CYCLE

AGREEMENT between Verizon Communications Inc. ("Verizon") and you (the "Participant").

**1. Purpose of Agreement.** The purpose of this Agreement is to provide a one-time grant of performance stock units ("PSUs") to the Participant.

**2. Agreement.** This Agreement is entered into pursuant to the terms of the 2001 Verizon Communications Inc. Long-Term Incentive Plan (the "Plan"), and evidences the grant of a performance stock award in the form of PSUs pursuant to the Plan. This Agreement is designed to comply with the requirements of Section 162(m) of the Code and the Treasury Department Regulations thereunder. The PSUs and this Agreement (including the covenants set forth in Exhibit A (the "Covenants"), which are incorporated into and shall be a part of the Agreement) are subject to the terms and provisions of the Plan. (The Participant may request a copy of the Plan from the Verizon Compensation and Executive Benefits Department.) By executing this Agreement, the Participant agrees to be bound by the terms and provisions of the Plan, and by the actions of the Plan Administrator, the Human Resources Committee of Verizon's Board of Directors or any successor thereto (the "Committee"), and any designee of the Committee.

**3. Contingency.** The grant of PSUs is contingent on the Participant's timely acceptance of this Agreement and satisfaction of certain other conditions contained herein. If the Participant does not properly accept (or revokes acceptance of) this Agreement the Participant shall not be entitled to the PSUs.

**4. Number of Units.** The Participant is granted the number of PSUs specified on the cover letter provided in conjunction with this Agreement. A PSU is a hypothetical share of Verizon's common stock. The value of a PSU on any given date shall be equal to the closing price of Verizon's common stock as of such date. A PSU does not represent an equity interest in Verizon and carries no voting rights. A Dividend Equivalent Unit ("DEU") or fraction thereof shall be added to each PSU each time that a dividend is paid on Verizon's common stock. The amount of each DEU shall be equal to the dividend paid on a share of Verizon's common stock. The DEU shall be converted into PSUs or fractions thereof based upon the average of the high and low sales prices of Verizon's common stock traded on the New York Stock Exchange on the dividend payment date of each declared dividend on Verizon's common stock, and such PSUs or fractions thereof shall be added to the Participant's PSU balance.

**5. Vesting.**

    **(a) General.** The Participant shall vest in the PSUs to the extent provided in paragraph 5(b) ("Performance Requirement") only if the Participant satisfies the requirements of paragraph 5(c) ("Three-Year Continuous Employment Requirement"), except as otherwise provided in paragraph 7 ("Early Cancellation/Accelerated Vesting of PSUs").

    **(b) Performance Requirement.**

        (1) The PSUs shall vest based on the average annual total shareholder return ("TSR") of Verizon's common stock during the three-year period beginning January 1, 2004, and ending December 31, 2006, relative to the combined weighted average annual TSR of the companies in

the Standard & Poor's 500 ("S&P 500 ®") Index and the companies in the Telecom Peer Company ("TPC") Index during the same three-year period as provided in the following table:

| Relative TSR Position | Vested Percentage of PSUs* |
|---|---|
| Below 20% | 0% |
| 20% | 40% |
| 30% | 60% |
| 40% | 80% |
| 50% | 100% |
| 60% | 120% |
| 70% | 140% |
| 80% or more | 200% |

*For amounts between 20% and 80%, the vested percentage of PSUs shall equal twice the Relative TSR Position (e.g., a Relative TSR Position of 52% equals a 104% vested percentage). However, the Committee's discretion to administer the Plan includes the absolute discretion to reduce the vested percentage of PSUs at any Relative TSR Position, and the Committee's exercise of this discretion shall be final, conclusive and binding.

Note: No PSUs shall vest if the Relative TSR Position is less than 20% and the maximum percentage of PSUs to vest shall be 200%.

(2) For purposes of the table set forth in paragraph 5(b)(1)—

(i) "Relative TSR Position" shall equal (A) 40% of the average annual Verizon S&P 500 TSR Position during the Award Cycle, plus (B) 60% of the average annual Verizon TPC TSR Position during the Award Cycle. The Committee's discretion to administer the Plan includes the absolute discretion to substitute or eliminate companies in the Telecom Peer Index and determine the Relative TSR Position for any period, and the Committee's exercise of this discretion shall be final, conclusive and binding.

(ii) "Verizon S&P 500 TSR Position" shall be, as determined by the Committee, Verizon's rank among companies in the S&P 500 Index in terms of TSR, expressed as a percentage equal to the number of companies in the S&P 500 Index with a TSR less than or equal to that of Verizon divided by the total number of companies in such index.

(iii) "Verizon TPC TSR Position" shall be, as determined by the Committee, where Verizon would rank among companies in the Telecom Peer Company Index in terms of TSR if Verizon were included in such index, expressed as a percentage equal to the number of companies in the TPC Index with a TSR less than or equal to that of Verizon divided by the total number of companies in such index.

(iv) "TSR" or "Total Shareholder Return" shall mean the change in the price of a share of common stock from the beginning of a period (as measured by the closing price of a share of such stock on the last trading day preceding the beginning of the period) until the end of such period (as measured by the closing price of a share of such stock on the last trading day of the period), adjusted to reflect the reinvestment of dividends (if any) through the purchase of common stock and as may be necessary to take into account stock splits or other events similar to those described in Section 4.3 of the Plan.

(v) "Award Cycle" shall mean the three-year period beginning on January 1, 2004, and ending at the close of business on December 31, 2006.

**(c) Three-Year Continuous Employment Requirement.** Except as otherwise determined by the Committee, the PSUs shall vest only if the Participant is continuously employed by the Company from the date the PSUs are granted through the end of the Award Cycle.

**(d) Transfer.** Transfer of employment from Verizon to a Related Company (as defined in paragraph 13), from a Related Company to Verizon, or from one Related Company to another Related Company shall not constitute a separation from employment hereunder, and service with a Related Company shall be treated as service with the Company for purposes of the three-year continuous employment requirement in paragraph 5(c).

**6. Payment.** All payments under this Agreement shall be made in cash. As soon as practicable after the end of the Award Cycle, except as described in paragraph 7(c), the value of the PSUs (minus any withholding for income taxes) shall be paid to the Participant (subject, however, to any deferral application that the Participant has made under the deferral plan (if any) then available to the Participant and under procedures adopted by the Plan Administrator). If the Participant dies before any payment due hereunder is made, such payment shall be made to the Participant's beneficiary. Once a payment has been made with respect to a PSU, the PSU shall be canceled.

**7. Early Cancellation/Accelerated Vesting of PSUs.** Subject to the provisions of paragraph 7(c), PSUs may vest or be forfeited before vesting in accordance with paragraph 5 as follows:

**(a) Voluntary Separation or Discharge for Cause.**

(1) If the Participant is not eligible to Retire (as defined in paragraph 7(b)(5)) and (i) quits, (ii) is terminated for Cause (as defined below), or (iii) separates from employment under circumstances not described in paragraph 7(b), all then-unvested PSUs shall be canceled immediately and shall not be payable.

(2) For purposes of this Agreement, "Cause" means (i) grossly incompetent performance or substantial or continuing inattention to or neglect of the duties and responsibilities assigned to the Participant; fraud, misappropriation or embezzlement involving the Company; or a material breach of the Code of Business Conduct or any of the Covenants set forth in Exhibit A to this Agreement, all as determined by the Plan Administrator in its discretion, or (ii) commission of any felony of which the Participant is finally adjudged guilty by a court of competent jurisdiction.

**(b) Retirement, Involuntary Termination Without Cause, Death or Disability.**

(1) This paragraph 7(b) shall apply if, on or before the last day of the Award Cycle, the Participant:

(i) Retires (as defined below), or

(ii) Separates from employment by reason of an involuntary termination without Cause (as determined by the Plan Administrator), death, or disability.

(2) Subject to paragraph 7(b)(3), if the Participant separates from employment under circumstances described in paragraph 7(b)(1), the Participant's then-unvested PSUs shall be subject to the vesting provisions set forth in paragraph 5(a), except that the three-year continuous employment requirement set forth in paragraph 5(c) shall not apply, provided that the Participant does not commit a material breach of any of the Covenants and provided that the Participant executes a release satisfactory to the Company waiving any claims he may have against the Company.

(3) The Participant shall vest under this paragraph 7(b) only in a percentage of the PSUs that would otherwise have vested based upon the ratio of (i) the number of months the Participant was actively at work during the Award Cycle to (ii) the total number of months in the Award Cycle. For this purpose, a Participant who is actively at work through and including the 15th day of any month shall receive credit for the full month, and a Participant who is not actively at work through and including the 15th day of the month shall not receive any credit for that month.

(4) Any PSUs that vest pursuant to paragraph 7(b)(3) shall be payable as soon as practicable after the end of the Award Cycle, except as described in paragraph 7(c). However, the Plan Administrator's discretion to administer the Plan includes the absolute discretion to determine whether and the extent to which the Participant is eligible to receive DEUs with respect to dividends declared after the Participant's separation from employment, and the Plan Administrator's exercise of this discretion shall be final, conclusive and binding.

(5) For purposes of this Agreement, "Retire" means (i) to retire after having attained at least 15 years of Net Credited Service (as defined under the Verizon Management Pension Plan) and a combination of age and years of Net Credited Service that equals or exceeds 75 points, or (ii) retirement under any other circumstances determined in writing by the Plan Administrator.

(c) **Change in Control.** Upon the occurrence of a Change in Control (as defined in the Plan) on or before the last day of the Award Cycle, all then-unvested PSUs shall vest and be payable immediately (without prorating of the award) at 50% of the maximum award payout without regard to the performance requirement in paragraph 5(b) or the three-year continuous employment requirement in paragraph 5(c); provided, however, that if the Participant terminates employment before the Change in Control occurs under the circumstances described in paragraph 7(b)(3), the immediately payable award described in this sentence shall be prorated as described in paragraph 7(b)(3). A Change in Control that occurs after the end of the Award Cycle shall have no effect on whether any PSUs vest or become payable. A Participant who receives the immediate award payment provided in this paragraph 7(c) shall be entitled to receive payment for all dividends declared before the Change in Control, even if such dividends are paid or payable after the Change in Control.

(d) **Vesting Schedule.** Except as provided in paragraphs 7(b) and (c), nothing in this paragraph 7 shall alter the vesting schedule prescribed by paragraph 5.

**8. Shareholder Rights.** The Participant shall have no rights as a shareholder with respect to shares of common stock to which this grant relates. Except as provided in the Plan or in this Agreement, no adjustment shall be made, for dividends or other rights for which the record date occurs while the PSUs are outstanding.

**9. Revocation or Amendment of Agreement.** Except to the extent required by law or specifically contemplated under this Agreement (including, but not limited to, the determination of Relative TSR Position, Verizon S&P 500 TSR Position, and Verizon TPC TSR Position, and whether the Participant has been terminated for Cause, has a disability, or has satisfied the three-year continuous employment

requirement), the Committee may not, without the written consent of the Participant, (a) revoke this Agreement insofar as it relates to the PSUs granted hereunder, or (b) make or change any determination or change any term, condition or provision affecting the PSUs if the determination or change would materially and adversely affect the PSUs or the Participant's rights thereto. Nothing in the preceding sentence shall preclude the Committee from exercising reasonable administrative discretion with respect to the Plan or this Agreement.

**10. Assignment.** The PSUs shall not be assignable or transferable except by will or by the laws of descent and distribution. During the Participant's lifetime, the PSUs may be deferred only by the Participant or by the Participant's guardian or legal representative.

**11. Beneficiary.** The Participant shall designate a beneficiary in writing and in such manner as is acceptable to the Plan Administrator. If the Participant fails to so designate a beneficiary, or if no such designated beneficiary survives the Participant, the Participant's beneficiary shall be the Participant's estate.

**12. Other Plans and Agreements.** Any gain realized by the Participant pursuant to this Agreement shall not be taken into account as compensation in the determination of the Participant's benefits under any pension, savings, group insurance, or other benefit plan maintained by Verizon or a Related Company, except as determined by the board of directors of such company. The Participant acknowledges that receipt of this Agreement or any prior PSU agreement shall not entitle the Participant to any other benefits under the Plan or any other plans maintained by the Company.

**13. Company and Related Company.** For purposes of this Agreement, "Company" means collectively Verizon and Related Companies. "Related Company" means (a) any corporation, partnership, joint venture, or other entity in which Verizon holds a direct or indirect ownership or proprietary interest of 50 percent or more, or (b) any corporation, partnership, joint venture, or other entity in which Verizon holds an ownership or other proprietary interest of less than 50 percent but which, in the discretion of the Committee, is treated as a Related Company for purposes of this Agreement.

**14. Employment Status.** The grant of the PSUs shall not be deemed to constitute a contract of employment between the Company and the Participant, nor shall it constitute a right to remain in the employ of any such company.

**15. Withholding.** The Participant shall be responsible for any income taxes and the employee portion of any employment taxes that arise in connection with this grant of PSUs, and the Company shall make such arrangements as it deems necessary for withholding of any taxes it determines are required to be withheld pursuant to any applicable law or regulation.

**16. Securities Laws.** The Company shall not be required to make payment with respect to any shares of common stock prior to the admission of such shares to listing on any stock exchange on which the stock may then be listed and the completion of any registration or qualification of such shares under any federal or state law or rulings or regulations of any government body that the Company, in its sole discretion, determines to be necessary or advisable.

**17. Committee Authority.** The Committee shall have complete discretion in the exercise of its rights, powers, and duties under this Agreement. Any interpretation or construction of any provision of, and the determination of any question arising under, this Agreement shall be made by the Committee in its sole discretion and shall be final, conclusive, and binding. The Committee may designate any individual or individuals to perform any of its functions hereunder.

**18. Successors.** This Agreement shall be binding upon, and inure to the benefit of, any successor or successors of the Company and the person or entity to whom the PSUs may have been transferred by will, the laws of descent and distribution, or beneficiary designation. All terms and conditions of this Agreement imposed upon the Participant shall, unless the context clearly indicates otherwise, be deemed, in the event of the Participant's death, to refer to and be binding upon such last-mentioned person or entity.

**19. Construction.** This Agreement is intended to grant the PSUs upon the terms and conditions authorized by the Plan. Any provisions of this Agreement that cannot be so administered, interpreted, or construed shall be disregarded. In the event that any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, such provision shall be considered separate and apart from the remainder of this Agreement, which shall remain in full force and effect. In the event that any provision is held to be unenforceable for being unduly broad as written, such provision shall be deemed amended to narrow its application to the extent necessary to make the provision enforceable according to applicable law and shall be enforced as amended.

**20. Defined Terms.** Except where the context clearly indicates otherwise, all capitalized terms used herein shall have the definitions ascribed to them by the Plan, and the terms of the Plan shall apply where appropriate.

**21. Execution of Agreement.** The Participant shall indicate consent to the terms of this Agreement (including its Exhibit) and the Plan by executing this Agreement pursuant to the instructions provided and otherwise complying with the requirements of paragraph 3. The Participant and Verizon hereby expressly agree that the use of electronic media to indicate confirmation, consent, signature, acceptance, agreement and delivery shall be legally valid and have the same legal force and effect as if the Participant and Verizon executed this Agreement (including its Exhibit) in paper form.

**22. Confidentiality.** Except to the extent otherwise required by law, the Participant shall not disclose, in whole or in part, any of the terms of this Agreement. This paragraph 22 does not prevent the Participant from disclosing the terms of this Agreement to the Participant's spouse or to the Participant's legal, tax, or financial adviser, provided that the Participant take all reasonable measures to assure that he or she does not disclose the terms of this Agreement to a third party except as otherwise required by law.

**23. Additional Remedies.** In addition to any other rights or remedies, whether legal, equitable, or otherwise, that each of the parties to this Agreement may have (including the right of the Company to terminate the Participant for Cause), the Participant acknowledges that—

    (a) The Covenants in Exhibit A to this Agreement are essential to the continued goodwill and profitability of the Company;

    (b) The Participant has broad-based skills that will serve as the basis for employment opportunities that are not prohibited by the Covenants in Exhibit A;

    (c) When the Participant's employment with the Company terminates, the Participant shall be able to earn a livelihood without violating any of the Covenants in Exhibit A;

    (d) Irreparable damage to the Company shall result in the event that the Covenants in Exhibit A are not specifically enforced and that monetary damages will not adequately protect the Company from a breach of these Covenants;

(e) If any dispute arises concerning the violation by the Participant of the Covenants in Exhibit A, an injunction may be issued restraining such violation pending the determination of such controversy, and no bond or other security shall be required in connection therewith;

(f) Such Covenants shall continue to apply after any expiration, termination, or cancellation of this Agreement; and

(g) The Participant's breach of any of such Covenants shall result in the Participant's immediate forfeiture of all rights and benefits under this Agreement.

---

**Exhibit A - Covenants**

**1. Noncompetition** — In consideration for the benefits described in the Agreement to which this Exhibit A is attached, you, the Participant, agree that:

(a) **Prohibited Conduct** — During the period of your employment with the Company, and for the period ending six months after your termination of employment for any reason from the Company, you shall not, without the prior written consent of the Plan Administrator:

(1) personally engage in Competitive Activities (as defined below); or

(2) work for, own, manage, operate, control, or participate in the ownership, management, operation, or control of, or provide consulting or advisory services to, any individual, partnership, firm, corporation, or institution engaged in Competitive Activities, or any company or person affiliated with such person or entity engaged in Competitive Activities; provided that your purchase or holding, for investment purposes, of securities of a publicly traded company shall not constitute "ownership" or "participation in ownership" for purposes of this paragraph so long as your equity interest in any such company is less than a controlling interest;

provided that this paragraph (a) shall not prohibit you from (i) being employed by, or providing services to, a consulting firm, provided that you do not personally engage in Competitive Activities or provide consulting or advisory services to any individual, partnership, firm, corporation, or institution engaged in Competitive Activities, or any company or person affiliated with such person or entity engaged in Competitive Activities, or (ii) engaging in the private practice of law as a sole practitioner or as a partner in (or as an employee of or counsel to) a law firm in accordance with applicable legal and professional standards.

(b) **Competitive Activities** — For purposes of the Agreement to which this Exhibit A is attached, "Competitive Activities" means business activities relating to products or services of the same or similar type as the products or services (1) which are sold (or, pursuant to an existing business plan, will be sold) to paying customers of the Company, and (2) for which you then have responsibility to plan, develop, manage, market, oversee or perform, or had any such responsibility within your most recent 24 months of employment with the Company. Notwithstanding the previous sentence, a business activity shall not be treated as a Competitive Activity if the geographic marketing area of the relevant products or services sold by you or a third party does not overlap with the geographic marketing area for the applicable products and services of the Company.

**2. Interference With Business Relations** — During the period of your employment with the Company, and for a period ending with the expiration of twelve (12) months following your termination of employment for any reason from the Company, you shall not, without the written consent of the Plan Administrator:

(a) recruit or solicit any employee of the Company for employment or for retention as a consultant or service provider;

(b) hire or participate (with another company or third party) in the process of hiring (other than for the Company) any person who is then an employee of the Company, or provide names or other

information about Company employees to any person, entity or business (other than the Company) under circumstances that could lead to the use of any such information for purposes of recruiting or hiring;

**(c)** interfere with the relationship of the Company with any of its employees, agents, or representatives;

**(d)** solicit or induce, or in any manner attempt to solicit or induce, any client, customer, or prospect of the Company (1) to cease being, or not to become, a customer of the Company or (2) to divert any business of such customer or prospect from the Company; or

**(e)** otherwise interfere with, disrupt, or attempt to interfere with or disrupt, the relationship, contractual or otherwise, between the Company and any of its customers, clients, prospects, suppliers, consultants, or employees.

**3. Return Of Property; Intellectual Property Rights** — You agree that on or before your termination of employment for any reason with the Company, you shall return to the Company all property owned by the Company or in which the Company has an interest, including files, documents, data and records (whether on paper or in tapes, disks, or other machine-readable form), office equipment, credit cards, and employee identification cards. You acknowledge that the Company is the rightful owner of any programs, ideas, inventions, discoveries, patented or copyrighted material, or trademarks that you may have originated or developed, or assisted in originating or developing, during your period of employment with the Company, where any such origination or development involved the use of Company time, information or resources, or the exercise of your responsibilities for or on behalf of the Company. You shall at all times, both before and after termination of employment, cooperate with the Company in executing and delivering documents requested by the Company, and taking any other actions, that are necessary or requested by the Company to assist the Company in patenting, copyrighting, protecting, enforcing or registering any programs, ideas, inventions, discoveries, works of authorship, data, information, patented or copyrighted material, or trademarks, and to vest title thereto solely in the Company.

**4. Proprietary And Confidential Information** — You shall at all times preserve the confidentiality of all Proprietary Information (defined below) and trade secrets of the Company, except and to the extent that disclosure of such information is legally required. "Proprietary information" means information or data related to the Company, including information entrusted to the Company by others, which has not been fully disclosed to the public by the Company and which is treated as confidential or protected within the business of the Company or is of value to competitors, such as strategic or tactical business plans; undisclosed financial data; ideas, processes, methods, techniques, systems, non-public information, models, devices, programs, computer software, or related information; documents relating to regulatory matters and correspondence with governmental entities; undisclosed information concerning any past, pending, or threatened legal dispute; pricing and cost data; reports and analyses of business prospects; business transactions that are contemplated or planned; research data; personnel information and data; identities of users and purchasers of the Company's products or services; and other confidential matters pertaining to or known by the Company, including confidential information of a third party that you know or should know the Company is obligated to protect.

**5. Definitions** — Except where clearly provided to the contrary, all capitalized terms used in this Exhibit A shall have the definitions given to those terms in the Agreement to which this Exhibit A is attached.

**6. Agreement to Covenants.** You shall indicate your agreement to these Covenants in accordance with the instructions provided. You and Verizon hereby expressly agree that the use of electronic media to indicate confirmation, consent, signature, acceptance, agreement and delivery shall be legally valid and have the same legal force and effect as if you and Verizon executed these Covenants in paper form.

EXHIBIT 10j(iv)(a)

**ADDENDUM TO VERIZON COMMUNICATIONS INC. LONG-TERM INCENTIVE PLAN**
**PERFORMANCE STOCK UNIT AGREEMENT**
**FOR THE 2005-2007 AWARD CYCLE**

This is an addendum to the Performance Stock Unit Agreement for the 2005-2007 Award Cycle (the "Agreement") entered into between Verizon Communications Inc. ("Verizon" or the "Company") and Ivan Seidenberg (the "Participant"). The effective date of this addendum is March 3, 2006, and it shall remain in effect through December 31, 2007.

**1. Purpose.** The purpose of this addendum is to describe the terms of an arrangement between the Participant and the Company wherein the Participant can earn a long-term incentive payout under the Agreement, based on the extent to which the Company achieves certain strategic objectives (as defined in paragraph 3 below) during the Award Cycle. Except as modified by this addendum, all of the terms and conditions of the Agreement shall remain in effect.

**2. Payment.** Subject to the limitation set forth in paragraph 4 below, the Committee shall have the sole discretion to determine the size of any additional payment pursuant to this addendum, based on the Company's achievement of the strategic objectives referred to in paragraph 3 below. This addendum and any payment made in accordance with this addendum are not intended to comply with the Performance-Based Exception (set forth in Code Section 162(m)(4)(C)) to the tax deductibility limitation imposed by Code Section 162(m).

**3. Achievement of Objectives.** The Committee shall have the sole discretion to determine whether the Participant is entitled to a payout pursuant to this addendum and the size of any such payout (subject to the limitations contained in paragraph 4 below), based on the Company's achievement of strategic objectives related to the successful launch of Verizon Business, key legislative initiatives, FiOS and broad band initiatives, and wireless growth objectives during the Award Cycle; provided that no payment shall be made pursuant to this addendum unless the Committee determines that, at the end of the three-year Award Cycle specified in paragraph 5 of the Agreement, Verizon's average annual total shareholder return during the Award Cycle met the specific threshold performance requirement specified in said paragraph 5.

**4. Aggregate Limitation.** The amount of any payment made under paragraph 6 of the Agreement (including any amount attributable to stock appreciation and dividend equivalent units payable under the terms of the Agreement and disregarding any deferral election) plus the amount of any payment under this addendum (disregarding any deferral election) shall not exceed $22.68 million.

**5. Payment.** Any payment pursuant to this addendum shall be made in cash. As soon as practicable after the end of the 2007 calendar year (but no later than March 15, 2008), the Committee shall determine whether an amount is to be paid pursuant to this addendum and the amount of any such payment. Any such amount (minus any withholding for taxes) shall be paid to the Participant no later than March 15, 2008 (subject, however, to any valid deferral election that the Participant has made under the deferral plan (if any) then available to the Participant). If the Participant dies before any payment due hereunder is made, such payment shall be made to the Participant's beneficiary.

**6. Defined Terms.** Except where the context clearly indicates otherwise, all capitalized terms used herein shall have the definitions ascribed to them by the Plan or the Agreement, and the terms of the Plan or Agreement shall apply where appropriate.

**IN WITNESS WHEREOF,** the parties hereto have entered into this addendum as of March 3, 2006.

**VERIZON COMMUNICATIONS INC.**                    **THE PARTICIPANT**

By: /S/  MARC C. REED _____          By: /S/  IVAN G. SEIDENBERG _____
      Marc C. Reed                                                                                  Ivan G. Seidenberg
      Executive Vice President

<center>A-2</center>

### VERIZON COMMUNICATIONS INC. LONG-TERM INCENTIVE PLAN
### RESTRICTED STOCK UNIT AGREEMENT
### 2006–08 AWARD CYCLE

AGREEMENT between Verizon Communications Inc. ("Verizon" or the "Company") and you (the "Participant") and your heirs and beneficiaries.

**1. Purpose of Agreement.** The purpose of this Agreement is to provide a grant of restricted stock units ("RSUs") to the Participant.

**2. Agreement.** This Agreement is entered into pursuant to the terms of the 2001 Verizon Communications Inc. Long-Term Incentive Plan (the "Plan"), and evidences the grant of a restricted stock award in the form of RSUs pursuant to the Plan. The RSUs and this Agreement (including the covenants set forth in Exhibit A (the "Covenants"), which are incorporated into and shall be a part of the Agreement) are subject to the terms and provisions of the Plan. By executing this Agreement, the Participant agrees to be bound by the terms and provisions of the Plan, this Agreement, and by the actions of the Human Resources Committee of Verizon Communication's Board of Directors or any successor thereto (the "Committee"), and any designee of the Committee. To the extent that there is a conflict between the terms of the Plan and the terms of this Agreement, the terms of this Agreement shall control.

**3. Contingency.** The grant of RSUs is contingent on the Participant's timely acceptance of this Agreement and satisfaction of the other conditions contained herein. If the Participant does not properly accept (or revokes acceptance of) this Agreement the Participant shall not be entitled to the RSUs regardless of the extent to which the vesting requirements in paragraph 5 ("Vesting") are satisfied.

**4. Number of Units.** The Participant is granted the number of RSUs as specified on their account under the 2006 RSU grant, administered by Fidelity Investments. A RSU is a hypothetical share of Verizon's common stock. The value of a RSU on any given date shall be equal to the closing price of Verizon's common stock on the New York Stock Exchange as of such date. A RSU does not represent an equity interest in Verizon and carries no voting rights. A Dividend Equivalent Unit ("DEU") or fraction thereof shall be added to each RSU each time that a dividend is paid on Verizon's common stock. The amount of each DEU shall be equal to the dividend paid on a share of Verizon's common stock. The DEU shall be converted into RSUs or fractions thereof based upon the average of the high and low sales prices of Verizon's common stock traded on the New York Stock Exchange on the dividend payment date of each declared dividend on Verizon's common stock, and such RSUs or fractions thereof shall be added to the Participant's RSU balance. To the extent that Fidelity or the Company makes an administrative error with respect to the number or value of the RSUs granted to the Participant under this Agreement, the Company specifically reserves the right to correct such error and the Participant agrees that he or she shall be legally bound by any corrective action taken by the Company or the Plan Administrator.

**5. Vesting.**

(a) **General.** The Participant shall vest in the RSUs only if the Participant is continuously employed by the Company or a Related Company (as defined in paragraph 13) from the date the RSUs are granted through the end of the Award Cycle, except as otherwise provided in paragraph 7 ("Early Cancellation/Accelerated Vesting of RSUs") or as otherwise provided by the Committee. For purposes of these RSUs, "Award Cycle" shall mean the three-year period beginning on January 1, 2006, and ending at the close of business on December 31, 2008.

**(b) Transfer.** Transfer of employment from Verizon to a Related Company (as defined in paragraph 13), from a Related Company to Verizon, or from one Related Company to another Related Company shall not constitute a separation from employment hereunder, and service with a Related Company shall be treated as service with the Company for purposes of the three-year continuous employment requirement in paragraph 5(a).

**6. Payment.** All payments under this Agreement shall be made in cash. As soon as practicable after the end of the Award Cycle (but in no event later than March 15, 2009), except as described in paragraph 7(c), the value of the vested RSUs (minus any withholding for taxes) shall be paid to the Participant (subject, however, to any deferral application that the Participant has made under the deferral plan (if any) then available to the Participant). The amount of cash that shall be paid (plus withholding for taxes and any applicable deferral election) shall equal the number of vested RSUs *times* the closing price of Verizon's common stock on the New York Stock Exchange as of the last trading day in the Award Cycle. If the Participant dies before any payment due hereunder is made, such payment shall be made to the Participant's beneficiary. Once a payment has been made with respect to a RSU, the RSU shall be canceled.

**7. Early Cancellation/Accelerated Vesting of RSUs.** Subject to the provisions of paragraph 7(c) and 5, RSUs may vest or be forfeited before vesting as follows:

(a) **Retirement Before July 1, 2006, Voluntary Separation On or Before December 31, 2008 or Discharge for Cause On or Before December 31, 2008.**

(1) If the Participant (i) Retires (as defined in paragraph 7(b)(4)) before July 1, 2006, (ii) quits on or before December 31, 2008, (iii) is terminated for Cause (as defined below) on or before December 31, 2008, or (iv) separates from employment on or before December 31, 2008 under circumstances not described in paragraph 7 (b), all then-unvested RSUs shall be canceled immediately and shall not be payable.

(2) For purposes of this Agreement, "Cause" means (i) grossly incompetent performance or substantial or continuing inattention to or neglect of the duties and responsibilities assigned to the Participant; fraud, misappropriation or embezzlement involving the Company; or a material breach of the Verizon Code of Business Conduct or any of the Covenants set forth in Exhibit A to this Agreement, all as determined by the Executive Vice President – Human Resources of Verizon in his or her discretion, and the exercise of such discretion shall be final, conclusive and binding, or (ii) commission of any felony of which the Participant is finally adjudged guilty by a court of competent jurisdiction.

(b) **Retirement After June 30, 2006, Involuntary Termination Without Cause On or Before December 31, 2008, Termination Due to Death or Disability On or Before December 31, 2008.**

(1) This paragraph 7(b) shall apply if the Participant:

(i) Retires (as defined below) after June 30, 2006, or

(ii) Separates from employment by reason of an involuntary termination without Cause (as determined by the Executive Vice President – Human Resources of Verizon), death, or disability (as defined below) on or before the last day of the Award Cycle. "Disability" shall mean the total and permanent disability of the Participant as defined by, or determined under, the Company's long-term disability benefit plan.

(2) If the Participant separates from employment prior to the end of the Award Cycle under circumstances described in paragraph 7(b)(1), the Participant's then-unvested RSUs shall vest without regard to the three-year continuous employment requirement set forth in paragraph 5(a), provided that the Participant has not and does not commit a material breach of any of the Covenants and provided that the Participant executes a release satisfactory to the Company waiving any claims he or she may have against the Company.

(3) Any RSUs that vest pursuant to paragraph 7(b)(2) shall be payable as soon as practicable after the end of the Award Cycle (but in no event later than March 15, 2009), except as described in paragraph 7(c). However, the Committee retains the discretion to determine whether and the extent to which the Participant is eligible to receive DEUs with respect to dividends declared after the Participant's separation from employment pursuant to paragraph 7(b)(1), and the Committee's exercise of this discretion shall be final, conclusive and binding.

(4) For purposes of this Agreement, "Retire" means (i) to retire after having attained at least 15 years of Net Credited Service (as defined under the Verizon Management Pension Plan) and a combination of age and years of Net Credited Service that equals or exceeds 75 points, or (ii) retirement under any other circumstances determined in writing by the Executive Vice President – Human Resources of Verizon.

**(c) Change in Control.** Upon the occurrence of a Change in Control of Verizon (as defined in the Plan) on or before the last day of the Award Cycle, all then-unvested RSUs shall vest and be payable immediately (without prorating of the award) without regard to the three-year continuous employment requirement in paragraph 5(a). A Change in Control that occurs after the end of the Award Cycle shall have no effect on whether any RSUs vest or become payable. A Participant who receives the immediate award payment provided in this paragraph 7(c) shall be entitled to receive payment for all DEUs earned before the Change in Control, even if such DEUs are paid or payable after the Change in Control.

**(d) Vesting Schedule.** Except and to the extent provided in paragraphs 7(b) and (c), nothing in this paragraph 7 shall alter the vesting schedule prescribed by paragraph 5.

**8. Shareholder Rights.** The Participant shall have no rights as a shareholder with respect to shares of common stock to which this grant relates. Except as provided in the Plan or in this Agreement, no adjustment shall be made, for dividends or other rights for which the record date occurs while the RSUs are outstanding.

**9. Revocation or Amendment of Agreement.** Except to the extent required by law or specifically contemplated under this Agreement (including, but not limited to, corrections of any administrative errors, the determination of whether the Participant has been terminated for Cause, has a disability, or has satisfied the three-year continuous employment requirement), the Committee or the Executive Vice President – Human Resources of Verizon may not, without the written consent of the Participant, (a) revoke this Agreement insofar as it relates to the RSUs granted hereunder, or (b) make or change any determination or change any term, condition or provision affecting the RSUs if the determination or change would materially and adversely affect the RSUs or the Participant's legitimate rights thereto. Nothing in the preceding sentence shall preclude the Committee or the Executive Vice President – Human Resources of Verizon from exercising reasonable administrative discretion with respect to the Plan or this Agreement, and the exercise of such discretion shall be final, conclusive and binding.

**10. Assignment.** The RSUs shall not be assigned, pledged or transferred except by will or by the laws of descent and distribution. During the Participant's lifetime, the RSUs may be deferred only by the Participant or by the Participant's guardian or legal representative in accordance with the deferral regulations, if any, established by the Company.

**11. Beneficiary.** The Participant shall designate a beneficiary in writing and in such manner as is acceptable to the Executive Vice President – Human Resources of Verizon. If the Participant fails to so designate a beneficiary, or if no such designated beneficiary survives the Participant, the Participant's beneficiary shall be the Participant's estate.

**12. Other Plans and Agreements.** Any payment received by the Participant pursuant to this Agreement shall not be taken into account as compensation in the determination of the Participant's benefits under any pension, savings, group insurance, severance or other benefit plan maintained by Verizon or a Related Company. The Participant acknowledges that receipt of this Agreement or any prior RSU agreement shall not entitle the Participant to any other benefits under the Plan or any other plans maintained by the Company or a Related Company.

**13. Company and Related Company.** For purposes of this Agreement, "Company" means Verizon Communications Inc. "Related Company" means (a) any corporation, partnership, joint venture, or other entity in which Verizon Communications Inc. holds a direct or indirect ownership or proprietary interest of 50 percent or more, or (b) any corporation, partnership, joint venture, or other entity in which Verizon Communications Inc. holds an ownership or other proprietary interest of less than 50 percent but which, in the discretion of the Committee, is treated as a Related Company for purposes of this Agreement.

**14. Employment Status.** The grant of the RSUs shall not be deemed to constitute a contract of employment for a particular term between the Company or a Related Company and the Participant, nor shall it constitute a right to remain in the employ of any such Company or Related Company.

**15. Withholding.** The Participant shall be responsible for any taxes that arise in connection with this grant of RSUs, and the Company shall make such arrangements as it deems necessary for withholding of any taxes it determines are required to be withheld pursuant to any applicable law or regulation.

**16. Securities Laws.** The Company shall not be required to make payment with respect to any shares of common stock prior to the admission of such shares to listing on any stock exchange on which the stock may then be listed and the completion of any registration or qualification of such shares under any federal or state law or rulings or regulations of any government body that the Company, in its discretion, determines to be necessary or advisable, and the exercise of such discretion shall be final, conclusive and binding.

**17. Committee Authority.** The Committee shall have complete discretion in the exercise of its rights, powers, and duties under this Agreement. Any interpretation or construction of any provision of, and the determination of any question arising under, this Agreement shall be made by the Committee in its discretion and such exercise shall be final, conclusive, and binding. The Committee may designate any individual or individuals to perform any of its functions hereunder.

**18. Successors.** This Agreement shall be binding upon, and inure to the benefit of, any successor or successors of the Company and the person or entity to whom the RSUs may have been transferred by will, the laws of descent and distribution, or beneficiary designation. All terms and conditions of this Agreement imposed upon the Participant shall, unless the context clearly indicates otherwise, be deemed, in the event of the Participant's death, to refer to and be binding upon the Participant's heirs and beneficiaries.

**19. Construction.** This Agreement is intended to grant the RSUs upon the terms and conditions authorized by the Plan. Any provisions of this Agreement that cannot be so administered, interpreted, or construed shall be disregarded. In the event that any provision of this Agreement is held invalid or unenforceable, such provision shall be considered separate and apart from the remainder of this Agreement, which shall remain in full force and effect. In the event that any provision, including any Covenant, is held to be unenforceable for being unduly broad as written, such provision shall be deemed amended to narrow its application to the extent necessary to make the provision enforceable according to applicable law and shall be enforced as amended.

**20. Defined Terms.** Except where the context clearly indicates otherwise, all capitalized terms used herein shall have the definitions ascribed to them by the Plan, and the terms of the Plan shall apply where appropriate.

**21. Execution of Agreement.** The Participant shall indicate consent to the terms of this Agreement (including its Exhibit) and the Plan by executing this Agreement pursuant to the instructions provided and otherwise shall comply with the requirements of paragraph 3. The Participant and Verizon hereby expressly agree that the use of electronic media to indicate confirmation, consent, signature, acceptance, agreement and delivery shall be legally valid and have the same legal force and effect as if the Participant and Verizon executed this Agreement (including its Exhibit) in paper form.

**22. Confidentiality.** Except to the extent otherwise required by law, the Participant shall not disclose, in whole or in part, any of the terms of this Agreement. This paragraph 22 does not prevent the Participant from disclosing the terms of this Agreement to the Participant's spouse or beneficiary or to the Participant's legal, tax, or financial adviser, provided that the Participant take all reasonable measures to assure that the individual to whom disclosure was made does not disclose the terms of this Agreement to a third party except as otherwise required by law.

**23. Applicable Law.** The validity, construction, interpretation and effect of this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the conflicts of laws provisions thereof.

**24. Notice.** Any notice to the Company provided for in this Agreement shall be addressed to the Company in care of the Executive Vice President – Human Resources of Verizon at One Verizon Way, Basking Ridge, NJ 07920-1097 and any notice to the Participant shall be addressed to the Participant at the current address shown on the payroll of the Company, or to such other address as the Participant may designate to the Company in writing. Any notice shall be delivered by hand, sent by telecopy or enclosed in a properly sealed envelope as stated above, registered and deposited, postage prepaid, in a post office regularly maintained by the United States Postal Service.

**25. Dispute Resolution.**

    **(a) General.** Except as otherwise provided in paragraph 26 below, all disputes arising under the Plan or this Agreement and all claims in which a Participant seeks damages that relate in any way to RSUs or other benefits of the Plan are subject to the dispute resolution procedure described below in paragraph 25. The parties to this Agreement are not required to arbitrate Employment Claims, as defined in subsection (a)(ii) below, in which the Participant does not seek damages that relate in any way to RSUs or other benefits of the Plan or this Agreement.

        (i) For purposes of this Agreement, the term "Units Award Dispute" shall mean any claim against the Company or a Related Company regarding (A) the interpretation of the Plan or this Agreement, (B) any of the terms or conditions of the RSUs issued under this