**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| YELLOWONE INVESTMENTS, an English Wales corporation,    Plaintiff,    v.    VERIZON COMMUNICATIONS, INC., a Delaware corporation, IDEARC INFORMATION SERVICES, INC. a Delaware corporation    Defendants. | Case No. 2-06-CV-475 TJW    Hon. T. John Ward |

## SUPPLEMENTATION OF THE RECORD REGARDING VERIZON COMMUNICATIONS INC.'S MOTION TO DISMISS

Yellowone Investments ("Yellowone") hereby submits the attached papers from Verizon Service Corp., et al., v. Vonage Holdings Corp., et al., 06-CV-682 from the United States District Court from the Eastern District of Virginia:

1.   Memorandum in Support of Verizon's Motion for Leave to Amend Complaint to Add Verizon Communications Inc. as a Plaintiff;

2.   Reply Brief in Support of Verizon's Motion for Leave to Amend Complaint to Add Verizon Communications Inc. as a Plaintiff;

3.   Order GRANTING Verizon's Motion for Leave to Amend.

Respectfully Submitted

By: */s/ Michael K. Friedland*
        Michael K. Friedland

Paul A. Stewart (*Pro Hac Vice*)
Michael K. Friedland (*Pro Hac Vice*)
Sheila N. Swaroop (*Pro Hac Vice*
KNOBBE, MARTENS, OLSON & BEAR, LLP

Dockets.Justia.com

2040 Main Street, Fourteenth Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-8502
pstewart@kmob.com
mfriedland@kmob.com

Melvin R. Wilcox (Lead Attorney)
State Bar No. 21454800
SMEAD, ANDERSON & DUNN LLP
2110 Horseshoe Lane,
P.O. Box 3343
Longview, TX 75606
Telephone: (903) 232-1892
Facsimile: (903) 232-1881
mrw@smeadlaw.com

Attorneys for Plaintiff,
YELLOWONE INVESTMENTS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this **SUPPLEMENTATION OF THE RECORD REGARDING VERIZON COMMUNICATIONS INC.'S MOTION TO DISMISS** via the Court's CM/ECF system per Local Rule CV-5(a)(3) on May 2, 2007.

*/s/ Michael K. Friedland*
Michael K. Friedland

3713145
050107

# DOCUMENT #1

FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

2007 JAN -5  P 4: 18

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |  |
|---|---|---|
| VERIZON SERVICES CORP., *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **1:06cv682 (CMH/BRP)** |
| | ) | |
| VONAGE HOLDINGS CORP., *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF VERIZON'S MOTION FOR LEAVE TO AMEND**
**COMPLAINT TO ADD VERIZON COMMUNICATIONS INC. AS A PLAINTIFF**

Plaintiffs Verizon Services Corp. and Verizon Laboratories Inc. (collectively, "Verizon")

move this Court for leave to amend the Complaint in this matter to add Verizon Communications

Inc. ("Verizon Communications") as a plaintiff, and in support thereof state as follows:

**INTRODUCTION**

In response to recent indications by Vonage of legal arguments it may attempt to make at

trial, Verizon recently assigned to Verizon Communications—the ultimate parent company of

plaintiffs Verizon Services Corp. and Verizon Laboratories Inc.—a joint and undivided interest

in the ownership of the seven patents-in-suit. As a co-owner of those patents, having the same

interest in the patents and in their infringement as the current plaintiffs, Verizon

Communications is now an appropriate plaintiff in this litigation. Verizon therefore seeks leave

to amend its Complaint to add Verizon Communications as a named plaintiff. The proposed

Amended Complaint is attached hereto as Exhibit 1.

Leave to amend a pleading under Federal Rule 15(a)[1] is to be "freely given when justice so requires," and is generally granted absent a demonstration of "undue prejudice" by the non-moving party. Because amending the Complaint to add Verizon Communications as a plaintiff will not introduce any new claims or additional issues in the litigation, or impose any burdens on Vonage, amendment will result in no prejudice to Vonage. Verizon's motion for leave to amend the Complaint should be granted.

## FACTUAL BACKGROUND

On January 5, 2007, plaintiffs Verizon Services Corp. and Verizon Laboratories Inc. executed assignments assigning to Verizon Communications an undivided joint ownership interest in all of the seven patents-in-suit. *See* Assignment between Verizon Services Corp. and Verizon Communications, dated January 5, 2007 (attached hereto as Exhibit 2) and Assignment between Verizon Laboratories Inc. and Verizon Communications, dated January 5, 2007 (attached hereto as Exhibit 3). Upon execution of those assignments, Verizon Communications became a joint owner of the patents-in-suit, holding an interest in those patents identical to that held by the assignors. The addition of Verizon Communications as a plaintiff is a ministerial act intended to reflect the new ownership of the patents-in-suit.

---

[1] Verizon discusses in the text the standards of Rule 15, but Verizon here also invokes Rule 21, because some courts, including this one, have characterized motions to amend that seek to add a party as being properly brought under Rule 21. *See, e.g., United States v. Thomas Howell Kiewit, Inc.*, 149 F.R.D. 125, 126 (E.D.Va. 1993) (noting that by filing a motion to add a party, the plaintiff "consequently . . . invoked Rule 21"). In the circumstances of this motion, however, any distinction between Rule 15 and Rule 21 is a distinction without a difference, because the same standards apply under both Rules. *See, e.g., Tao Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 571 (E.D.Va. 2004) (implicitly applying Rule 21 to a motion to amend the complaint to add a party and reciting the liberal standard applied under Rule 15*). See also* Wright & Miller, 6 Fed. Prac. & Proc. Civ. 2d § 1479 (2006) (noting that courts entertaining a motion under Rule 21 "frequently conclude[ ] that whether it [should] be granted is to be governed by the liberal amendment standards of Rule 15(a)").

Verizon has effected this assignment to simplify the case by removing an issue that

Verizon believes—from statements made and actions taken by Vonage in discovery—Vonage

intends to present to this Court. That issue is whether the existing plaintiffs lack standing to seek

injunctive relief because the existing plaintiffs do not themselves sell products or services or

receive the profits from such sales. Although Verizon believes that any such argument, if made,

would be unsuccessful, in an abundance of caution Verizon seeks to amend its pleadings to

ensure that the procedural posture of this case accurately reflects the economic realities here at

stake. The assignment of an undivided joint interest in the patents to Verizon Communications,

which owns and reports the profits from all of its operating subsidiaries, including 55% of the

profits of Verizon Wireless, aligns patent ownership with the Verizon entity suffering the lost-

profit effects of Vonage's infringement, and thus simplifies the case for trial.[2]

## ARGUMENT

Verizon's proposed amendment is clearly permissible under Federal Rule 15(a), which

provides that that leave to amend "shall be freely given when justice so requires." The Supreme

Court has admonished that the liberal mandate of Rule 15(a) "is to be heeded." *Foman v. Davis*,

371 U.S. at 182. Under that liberal standard, the proposed amendment is proper under the case-

law governing requests for amendment by patent co-owners. And, given the absence of

---

[2] As part of that simplification, Verizon notes that, as to *damages* incurred prior to the date of the assignment, Verizon will claim only a reasonable royalty, not lost profits. That simplification eliminates the question raised by *Poly-America v. GSE Lining Technology*, 383 F.3d 1303 (Fed. Cir. 2004) about whether the existing plaintiffs could obtain lost profits. It is perfectly clear under the Federal Circuit's decision in *Union Carbide Chemicals & Plastics Technology Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1377-78 (Fed. Cir. 2005), however, that the reasonable royalty to which the existing plaintiffs are entitled—the royalty to which they would have agreed (in the hypothetical negotiation that is posited for calculating the royalty)—would have reflected the profits lost by Verizon Communications and its operating units.

prejudice to Vonage, the proposed amendment is proper under the standards governing amendments generally.

### A. As Co-Owner of the Patents-In-Suit, Verizon Communications Is Required To Join This Litigation as a Plaintiff, And Amendment Is Proper For That Reason Alone.

Basic principles of substantive patent law establish that the addition of Verizon Communications as a plaintiff is appropriate and, indeed, required—especially here, where the addition will result in no prejudice to Vonage. It is well established that a co-owner of a patent is required to join as a plaintiff in an infringement action relating to that patent. *See, e.g., Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1331 (Fed. Cir. 2001) (stating that "United States patent law . . . requires that all co-owners normally must join as plaintiffs in an infringement suit"). In the circumstance in which a co-owner is not yet a party, amendment is particularly appropriate under the liberal amendment regime embodied in Rule 15(a), the primary purpose of which is to permit reform of pleadings to eliminate technical deficiencies and permit litigation to be resolved on its merits. As the Supreme Court has stated, under Rule 15(a), "if the underlying facts or circumstances relied on by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claims on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Pittston Co. v. United States*, 199 F.3d 694, 705 (4th Cir. 1999) (quoting *Foman*).

Courts that have considered amendment in this context agree that where the proposed new plaintiff is a co-owner of the patents-in-suit—or even merely an exclusive licensee—the amendment is appropriate and should be granted. For example, in *Kalman v. Berlyn Corp.*, 914 F.2d 1473 (Fed. Cir. 1990), plaintiff Kalman brought an infringement suit against defendant Berlyn. Kalman then sought to amend his complaint to add as a plaintiff PDL, a company that

4

manufactured and sold products covered by the patent-in-suit and in which Kalman held a 50%

interest. *Id.* at 1475-76. The district court denied the motion on the ground that PDL was not an

exclusive licensee of the patent and thus lacked standing. *Id.* at 1477. The Federal Circuit

reversed, concluding that (a) PDL's relationship with Kalman was sufficiently similar to an

exclusive license to warrant the conclusion that PDL had standing sufficient to bring the suit, and

(b) where the defendant had long had reason to know of PDL's interest and role in the case, and

where defendant clearly regarded Kalman and PDL to be a single economic entity for purposes

of damage determinations, the defendant suffered no prejudice from the addition of PDL as a

plaintiff. *Id.* at 1479-81.

Similarly, the district court for the District of New Jersey recently addressed issues very

similar to those presented in this motion, and concluded that where the original plaintiff had

assigned its interest in the patent-in-suit to a related corporate entity, leave to amend the

complaint to add that entity as a plaintiff must be granted "to prevent substantial injustice"—

namely, dismissal of the suit. *Mars, Inc. v. Coin Acceptors, Inc.*, 2006 WL 2927240 at *9

(D.N.J. Aug. 7, 2006). *Cf. Site Microsurgical Sys. Inc. v. The Cooper Cos.*, 797 F. Supp. 333,

339 (D.Del. 1992) (denying motion for leave to amend complaint to add parent company as

plaintiff on the ground of futility, where the parent company was *not* an owner of the patent-in-

suit).

As these authorities establish, a motion for leave to amend the complaint where the

proposed new plaintiff is a co-owner of the patent should be granted as a matter of course.

Verizon's motion for leave to amend its complaint is clearly proper—especially because no

prejudice will occur to Vonage from such an amendment.

5

**B.    Because Vonage Will Suffer No Prejudice As A Result of the Amendment, Verizon's Motion For Leave to Amend Should Be Granted Under Rule 15(a).**

The proposed amendment is also proper under the standards applicable to amendments generally. In evaluating a motion for leave to amend under Rule 15, the Fourth Circuit[3] "focuses on prejudice or futility or bad faith as the only legitimate concerns in denying leave to amend." *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980); *see also Fletcher v. Tidewater Builders Ass'n Inc.*, 216 F.R.D. 584, 587 (E.D.Va. 2003) (noting that "[l]eave to amend may be denied for undue delay, dilatory motive on the part of the moving party, futility of amendment, and undue prejudice to the nonmoving party").

Applying this standard, Verizon's motion for leave to amend the Complaint should be granted. There is no question here of futility or bad faith: as a joint owner of the patents-in-suit, Verizon Communications clearly has standing to bring the infringement claims against Vonage, and Verizon is seeking this amendment now simply to respond to possible legal issues that have been raised by Vonage in discovery—issues that Verizon believes lack merit, but which are better resolved by means of a simple pleading amendment now.

More importantly, the amendment will result in no prejudice to Vonage. "Prejudice," in this context, requires more than mere inconvenience. *See Cuffy v. Getty Refining & Marketing Co.*, 648 F. Supp. 802, 806 (D.Del. 1986). To demonstrate prejudice sufficient to warrant denial of a motion to amend, the non-moving party "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the amendments been timely." *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing*, 663 F.2d 419, 426

---

[3]    On appeal, the Federal Circuit reviews a trial court's resolution of motions under Rule 15(a) using the law of the regional circuit—here, the Fourth. *See, e.g., Optivus Tech., Inc. v. Ion Beam Applications*, 469 F.3d 978, 985 (Fed. Cir. 2006).

(3d Cir. 1981). For that reason, a party usually "will not be prejudiced by an amended pleading if the amendment relates to the same conduct, transaction, or occurrence alleged in the original pleading, or if the opposing party is otherwise aware of the facts contained in the amended pleading." 27A Fed. Proc., L.Ed. §62.279 (2006); *see also Defender Indus., Inc. v. Northwestern Mut. Life Ins. Co.*, 938 F.2d 502, 508 (4th Cir. 1991) (affirming grant of motion to amend complaint where non-moving party "was aware prior to trial" that the moving party might raise the new claim).

No "unfair disadvantage" can result from an amendment where the amendment raises no new claims or issues, and the non-movant has had ample opportunity to prepare for the issues in suit. For example, in *Ward Electronics Serv., Inc. v. First Comm. Bank*, 819 F.2d 496 (4th Cir. 1987), the Fourth Circuit reversed the district court's denial of a motion to amend the complaint, noting that because "the proposed amendment was based on information that was always in the possession" of the non-moving party, that party "could not have been prejudicially surprised" by the amendment. *Id.* at 497. See also *Aerotek, Inc. v. Tyonek Native Corp.*, No. 1:05-CV-1080, 2006 WL 1303142 at *2-3 (E.D.Va. Apr. 12, 2006) (concluding that no prejudice existed where the plaintiff sought to add as a defendant a company that had previously been dismissed from the lawsuit, and the existing defendant could identify no burden greater than the extension of the discovery period).

Here, the addition of Verizon Communications—the parent company of the current plaintiffs—will not alter Verizon's patent infringement claims or Vonage's defenses to those claims in any way, and will not require any additional discovery. Throughout discovery, and every other aspect of this case, Verizon has been treated by both parties as one entity. Most tellingly, Verizon has produced witnesses and documents from all of its subsidiaries and related

7

companies, including Verizon Wireless, and Vonage has deposed witnesses and reviewed documents from all such Verizon entities.

Moreover, each side's damages analyses in this have case have treated Verizon as one economic entity—both as to lost profits and a reasonable royalty, and even as to the appropriateness of an injunction in this case. Both damages experts, for example, have used Verizon Communications' financial disclosures in calculating the correct measure of damages in this case. *See, e.g.,* Expert Report of Steven Shavell, dated November 15, 2006, at 58 (calculating damages using figures reported in Verizon Communications' 2005 Annual Report on Form 10-K); *see also* Expert Rebuttal Report of John C. Jarosz, dated December 8, 2006, at 7, 8, 33-34, and Tab 7 (describing Verizon Communications revenues and profits and utilizing them in damages calculations).

In sum, Vonage has had every opportunity to prepare for trial on all Verizon issues, and granting leave to amend the Complaint by adding Verizon Communications as a plaintiff will impose no surprise, burden, or other harm on Vonage or its preparations for trial. In these circumstances, no prejudice exists and Verizon's motion to amend should be granted. *See Aerotek, supra* (permitting plaintiff to amend the complaint and add a party in the interest of "judicial economy and justice" and in the absence of "any compelling reason to preclude" the amendment); *see also* 27A Fed. Proc., L.Ed. § 62.279 (2006) (stating that "[a]n amendment changing parties will not normally result in prejudice if the new parties, whether plaintiffs of defendants, are closely related to the original parties" and that "a party will generally not be prejudiced by an amended pleading where elements of the new claim almost entirely overlap the elements of the original claim").

Because Verizon's motion for leave to amend the Complaint falls well within the class of motions for which leave is to be "freely given" under Rule 15(a), and because no prejudice to Vonage will result, Verizon's motion should be granted.

WHEREFORE, for the foregoing reasons, Verizon respectfully moves this Honorable Court for leave to amend the Complaint to add Verizon Communications Inc. as a named plaintiff in this action, and for such further relief as this Court deems just and proper.

Dated: January 5, 2007               Respectfully submitted,

VERIZON SERVICES CORP. and
VERIZON LABORATORIES INC.

Charles B. Molster, III (VA Bar No. 23613)
Winston & Strawn LLP
1700 K Street, NW
Washington, DC  20006
(202) 282-5988
(202) 282-5100(fax)
cmolster@winston.com

Dan K. Webb*
Peter C. McCabe*
Peggy M. Balesteri*
Winston & Strawn LLP
35 West Wacker Dr.
Chicago, Illinois 60601
(312) 558-5600

Richard Cullen (VA Bar No. 16765)
Brian C. Riopelle (VA Bar No. 36454)
McGuire Woods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

John Thorne (Virginia Corporate Counsel)*
Robert H. Griffen (Virginia Corporate Counsel)*
Verizon Services Corp.
1515 North Courthouse Road

9

Fifth Floor
Arlington, Virginia 22201
(703) 351-3900

Leonard Charles Suchyta*
Verizon Corporate Services Group Inc.
One Verizon Way
Basking Ridge, NJ 07920
(908) 559-5623


*Counsel for Verizon Services Corp. and Verizon
Laboratories Inc.*

* admitted *pro hac vice*

10

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing Notice of Motion, Motion to

For Leave to Amend Complaint To Add Verizon Communications Inc. As A Plaintiff,

Memorandum in Support, and Proposed Order to be sent by email and first-class mail on this 5th

day of January 2007 upon the following:

> Scott W. Doyle
> Seth A. Watkins
> Steven J. Barber
> STEPTOE & JOHNSON LLP
> 1330 Connecticut Avenue
> Washington, D.C. 20036

Charles B. Molster, III

11

Exhibit 1

Amended Complaint for Injunctive and Other Relief

Exhibit 2

Assignment from Verizon Services Corp. to Verizon
Communications Inc.

Patent Assignment – Joint Owners
(VSC and VCI)

## ASSIGNMENT

This ASSIGNMENT is effective as of January 5, 2007 between Verizon Services Corp., a corporation existing under the laws of Delaware, located and doing business at 1310 North Court House Road, Arlington, Virginia 22201 (hereinafter "ASSIGNOR"), and Verizon Communications Inc., a corporation existing under the laws of Delaware and located and doing business at 140 West Street, New York, New York, 10007 (hereinafter "ASSIGNEE").

WHEREAS, ASSIGNEE is desirous of acquiring an ownership interest in the United States and/or foreign Letters Patent and Applications for Letters Patent identified in Schedule A, and the inventions disclosed therein.

WHEREAS, ASSIGNOR is desirous of granting to ASSIGNEE an undivided joint ownership interest with ASSIGNOR in the aforesaid inventions and United States and/or foreign Letters Patent and Applications for Letters Patent.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by ASSIGNOR and ASSIGNEE, and subject to any rights and licenses granted to third parties on or before the effective date hereof, ASSIGNOR does hereby assign unto ASSIGNOR and ASSIGNEE together an undivided joint ownership in all rights, title and interest of ASSIGNOR in and to the aforesaid inventions and United States and/or foreign Letters Patent and Applications for Letters Patent identified hereinabove, including all inventions and improvements described therein, any legal equivalent thereof in all countries (subject, however, to applicable patent laws in such countries), the right to claim priority therefrom, and in and to all additional Letters Patent worldwide to be obtained from such Letters Patent, Applications for Letters Patent, and inventions from any future applications, continuations, divisions, renewals, extensions, substitutes, reissues or re-examinations thereof, each and all to be held and enjoyed by ASSIGNOR and ASSIGNEE, their successors and assigns, to the full end of the terms for which any Letters Patent are granted, plus any extensions, as fully and entirely as the same would have been held and enjoyed by ASSIGNOR had this assignment not been made, together with all claims for damages by reason of past and future infringement of said Letters Patent and inventions, with the right to sue for, and collect the same for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives.

ASSIGNOR authorizes and requests the Commissioner of Patents and Trademarks to issue any and all United States Letters Patent resulting from the inventions and Applications for Letters Patent listed hereinabove or any divisions, reissues, continuations (in whole or in part), renewals, extensions, substitutes or re-examinations thereof to ASSIGNOR and ASSIGNEE together as assignee of ASSIGNOR's interest therein.

Verizon Services Corp.

By: _Janis M. Manning_

Name: _Janis M. Manning_

Title: _Assistant Secretary_

Patent Assignment – Joint Owners
(VSC and VCI)

## <u>SCHEDULE A</u>

| Country | Patent or Application Number | Title |
|---------|------------------------------|-------|
| US | 6,359,880 | PUBLIC WIRELESS/CORDLESS INTERNET GATEWAY |
| US | 6,430,275 | ENHANCED SIGNALING FOR TERMINATING RESOURCE |
| US | 6,137,869 | NETWORK SESSION MANAGEMENT |
| US | 6,104,711 | ENHANCED INTERNET DOMAIN NAME SERVER |
| US | 6,282,574 | METHOD, SERVER AND TELECOMMUNICATIONS SYSTEM FOR NAME TRANSLATION ON A CONDITIONAL BASIS AND/OR TO A TELEPHONE NUMBER |

Exhibit 3

Assignment from Verizon Laboratories Inc.
to Verizon Communications Inc.

## ASSIGNMENT

This ASSIGNMENT is effective as of January 5, 2007 between Verizon Laboratories Inc., a corporation existing under the laws of Delaware, located and doing business at 40 Sylvan Road, Waltham, Massachusetts 02451  (hereinafter "ASSIGNOR"), and  Verizon Communications Inc., a corporation existing under the laws of Delaware and located and doing business at 140 West Street, New York, New York, 10007  (hereinafter "ASSIGNEE").

WHEREAS, ASSIGNEE is desirous of acquiring an ownership interest in the United States and/or foreign Letters Patent and Applications for Letters Patent identified in Schedule A, and the inventions disclosed therein.

WHEREAS, ASSIGNOR is desirous of granting to ASSIGNEE an undivided joint ownership interest with ASSIGNOR in the aforesaid inventions and United States and/or foreign Letters Patent and Applications for Letters Patent.

NOW, THEREFORE, in consideration of the premises and the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by ASSIGNOR and ASSIGNEE, and subject to any rights and licenses granted to third parties on or before the effective date hereof, ASSIGNOR does hereby assign unto ASSIGNOR and ASSIGNEE together an undivided joint ownership in all rights, title and interest of ASSIGNOR in and to the aforesaid inventions and United States and/or foreign Letters Patent and Applications for Letters Patent identified hereinabove, including all inventions and improvements described therein, any legal equivalent thereof in all countries (subject, however, to applicable patent laws in such countries), the right to claim priority therefrom, and in and to all additional Letters Patent worldwide to be obtained from such Letters Patent, Applications for Letters Patent, and inventions from any future applications, continuations, divisions, renewals, extensions, substitutes, reissues or re-examinations thereof, each and all to be held and enjoyed by ASSIGNOR and ASSIGNEE, their successors and assigns, to the full end of the terms for which any Letters Patent are granted, plus any extensions, as fully and entirely as the same would have been held and enjoyed by ASSIGNOR had this assignment not been made, together with all claims for damages by reason of past and future infringement of said Letters Patent and inventions, with the right to sue for, and collect the same for its own use and enjoyment, and for the use and enjoyment of its successors, assigns or other legal representatives.

Patent Assignment – Joint Owners
(VLI and VCI)

## SCHEDULE A

| Country | Patent or Application Number | Title |
|---------|------------------------------|-------|
| United States | 6,128,304 | NETWORK PRESENCE FOR A COMMUNICATIONS SYSTEM OPERATING OVER A COMPUTER NETWORK |
| United States | 6,298,062 | SYSTEM PROVIDING INTEGRATED SERVICES OVER A COMPUTER NETWORK |

# DOCUMENT #2

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

2007 JAN 11  P 4: 28

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA
cc to cuit/BRP

| | |
|---|---|
| VERIZON SERVICES CORP., *et al.,* | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| VONAGE HOLDINGS CORP., *et al.,* | ) |
| | ) |
| | ) |
| Defendants. | ) |

1:06cv682 (CMH/BRP)

## REPLY BRIEF IN SUPPORT OF VERIZON'S MOTION FOR LEAVE TO AMEND
## COMPLAINT TO ADD VERIZON COMMUNICATIONS INC. AS A PLAINTIFF

Vonage's Opposition to Verizon's motion for leave to amend the Complaint to add
Verizon's parent company as a plaintiff ("Motion to Amend") fails to provide any justification
for denying the motion, and the Motion to Amend should be granted.

### INTRODUCTION

Vonage does not dispute that Verizon simply seeks leave to add its parent company, now
a co-owner of the patents-in-suit, as a plaintiff in this case.  Vonage does not deny that patent law
requires co-owner Verizon Communications Inc. to be joined.  And what Vonage says about
both timeliness and prejudice is devoid of substance.  In the end, Vonage is just bemoaning the
loss of the "gotcha" defense it was quietly preparing to spring, but that desire to avoid the
merits—while understandable from Vonage's perspective—is not a cognizable prejudice, and
there is no other.  The Court should grant the motion.  The case can then proceed on the clean
premises the motion makes possible: backward-looking relief limited to a reasonable royalty (to
which the entire Verizon entity's profits are indisputably relevant, *see Union Carbide Chem. &*

DC:498628.4

220

*Plastics Techn. Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1378 (Fed. Cir. 2005)); and forward-looking relief focused on the interests of the parent company that actually owns and reports the profits of the service-selling units.

A few basic facts are worth highlighting. *First,* as Vonage concedes in its Opposition, Verizon did not even begin to gain wind of Vonage's possible litigation strategy regarding the standing of the original plaintiffs until, at the earliest, the end of November, 2006; and even then Vonage did not raise the defense, but merely asked questions at a deposition that suggested that Vonage might be thinking about whether the existing plaintiffs were the right Verizon entities to make all the claims for relief being made. Vonage never amended its interrogatory responses (or anything else) to identify the defense, and instead Vonage did its best to mask its "gotcha" strategy for this defense, including the fact—revealed only its Opposition (at 2)—that Vonage apparently planned to seek summary judgment on the defense.

*Second*, Vonage has identified *no* prejudice to its conduct of the case (aside from hoping to win on an essentially non-merits ground). Its claim of prejudice, when it is not conclusory, actually focuses *not* on the addition of Verizon Communications, but on Verizon's *dropping* of a retrospective lost-profits claim in its motion, saying that Vonage would have avoided asking questions on that subject during depositions if the lost-profits demand had been dropped earlier. Opposition at 3. But that re-focusing on what has been *dropped* (which Verizon is free to do without amendment) claims no prejudice from *adding* the parent company; and in any event, it is plainly incorrect. *Union Carbide* is explicit that the *reasonable royalty* claim – which plaintiffs have always *also* included an an alternative – properly considers lost profits of the parent company's entire business, so the profits of that entire business *had to be explored* as part of the reasonable-royalty inquiry regardless. Not surprisingly, Verizon's document production covered

2

the businesses of the parent company (the only reporting entity in the family). And Verizon's expert, in discussing lost profits (both directly and as a factor in the reasonable royalty calculus), expressly considered the entire business as a unit. There is simply nothing new.

ARGUMENT

Not finding sufficient stringency in the liberal amendment standard of Rule 15(a), Vonage looks to the "good cause" standard of Rule 16(b) as an additional requirement. It cites no authority from the Fourth Circuit or this District applying Rule 16(b) to override Rule 15(a), however, and we know of none.[1] Under the principle that the specific governs over the general (*e.g.*, *NCTA v. Gulf Power Co.*, 534 U.S. 327, 335 (2002)), Rule 16(b)'s general provisions about all pre-trial scheduling orders (which are routine in virtually all cases) should not override Rule 15(a), the provision that addresses the specific subject of pleading amendments and makes clear that such amendments late in the litigation are a commonplace. But the question need not be decided, because the circumstances *both* establish "good cause" *and* meet Rule 15(a)'s standards.

**A.    Verizon Has Demonstrated Good Cause For Its Amendment Under Rule 16(b).**

The "good cause" standard of Rule 16(b), if applied to a pleading amendment proposed after a scheduling-order deadline, would inquire into "the timeliness of the amendment and the reasons for its tardy submission," focusing on "the diligence of the movant." *Sensormatic Security Corp. v. Sensormatic Electronics Corp.*, 2004 WL 86179, at *3 (D.Md. Jan. 20, 2004). For example, in *Stewart v. Coyne Textile Servs.*, 212 F.R.D. 494 (S.D.W.Va. 2003), the district

---

[1] Vonage cites *Stewart v. Coyne Textile Servs.*, 212 F.R.D. 494, 496-96 (S.D.W.Va. 2003) (finding good cause). It does not appear that the Fourth Circuit or this District has addressed the proper relationship between Rule 15(a) and Rule 16(b). *See Sensormatic Security Corp. v. Sensormatic Electronics Corp.*, 2004 WL 86179 (D.Md. Jan. 20, 2004) (noting that "[i]n an unpublished opinion, *Lone Star Indus., Inc.* 19 F.3d 1429 (4th Cir. 1994) (table), the Fourth Circuit refused to consider whether the district court was correct to link Rule 15(a) and 16(b) because it concluded that the amending party met both standards").

3

court found good cause where (a) the plaintiff filed its motion to amend three months after the scheduling order's deadline for amendments, and (b) the stated reason for the late amendment was the defendant's belated response to plaintiff's discovery requests, which resulted in plaintiff's receiving the information supporting the amendment from the defendant two months after the amendment deadline. 212 F.R.D. at 496-97. The *Stewart* court found that good cause to amend existed even though the plaintiff had acquired the relevant information earlier "from other sources." *Id.* at 497. In *Sensormatic Security Corp.*, on the other hand, the district court denied a motion to amend for lack of good cause where the plaintiff acknowledged that it learned of the facts underlying the proposed amendment "a month prior to the scheduling order deadline for amendments of the pleadings" and conceded that it "could have filed a motion to amend the Scheduling Order" prior to the deadline. 2004 WL at *3.

Here, Vonage complains that Verizon's Motion to Amend is untimely in light of the October 27, 2006 deadline for amending the pleadings established by the parties' Discovery Plan. But Vonage then admits that Vonage itself was the party that "put this 'issue' on the table" and identifies November 21, 2006 as the earliest—and December 4, 2006 as possibly the latest—date on which Vonage did so. Opposition at 2. This motion was filed little more than one month later—a month containing the winter holidays and massive amounts of discovery and other pretrial work.

At no point has Vonage ever amended its interrogatory answers, or otherwise informed Verizon that Vonage would be pursuing this defense or planning to move for summary judgment on the issue. In fact, Verizon did not begin to research Vonage's standing defense until the middle of December. After conducting that research, Verizon promptly began to analyze the possibility of using an intercorporate assignment to align the pleadings with the economic

realities of the case—a solution that Verizon effected on January 5, 2007. In these circumstances, Verizon has demonstrated due diligence in filing its motion for leave to amend, and thus has satisfied the "good cause" requirement of Rule 16(b).

None of the cases cited by Vonage supports denial of the Motion to Amend on untimeliness grounds in the circumstances presented here. In *Vargas v. McNamara*, 608 F.2d 15 (1st Cir. 1979), for example, the plaintiffs attempted to amend their complaint "at the close of plaintiffs' evidence" at trial, and were attempting to add not a new party but a wholly new legal theory of liability.[2] *Id.* at 18-19. Here, by contrast, Verizon is *not* attempting to add a new theory of liability. As explained above, Verizon's amendment would simply add Verizon's parent company to align the pleadings with the financial and economic reality of this case.

This case is also unlike *Chitimacha Tribe of Louisiana v. Harry L. Laws Co.*, 690 F.2d 1157, 1163 (5th Cir. 1982). There the court denied a motion to amend filed "two years and three months after" the filing of the original complaint, but cautioned that in complex litigation even so lengthy a delay "is not dispositive." *Id.* at 1164. The court ultimately denied the motion because the plaintiffs "offered no justification" for their failure to amend the complaint earlier and because the amendment was "irrelevant" to their claim in any event. *Id.* Here, by contrast, Verizon has provided a full explanation and justification for not amending the Complaint earlier, and Vonage does not—and cannot—dispute that the amendment is highly relevant to Verizon's claims.

This case is also very different from *Goss v. Revlon, Inc.*, 548 F.2d 405 (2d Cir. 1976), in which the plaintiff filed a complaint that was barred by a failure to exhaust his administrative

---

[2]     Even in those rather extraordinary circumstances, the Court of Appeals remanded the case to the district court for a determination of whether granting the motion was "in the interest of justice and not unduly prejudicial to defendants." *McNamara*, 608 F.2d at 19.

remedies, and then sought to amend, alleging "myriad new causes of action" under three different statutes and the Constitution and also seeking class status, and offering "no reason for his extended and undue delay."[3] *Id.* at 407. Here again, Verizon has provided ample reason for its delay—which is neither "extended" nor "undue" in any event. And Verizon's amendment would add no new theories of liability to the case.

In short, Vonage has provided no authority for the proposition that in a case like this—where Verizon seeks only to add its parent company and has moved to amend its Complaint in response to its opponent's previously unknown summary judgment and trial strategy, and did so barely one month after that strategy began to be implicitly alluded to in discovery—there is any basis for denying a motion for leave to amend a complaint. To the contrary, Vonage's own authorities establish that the present motion should be granted.

**B.** **Vonage Has Failed To Demonstrate Prejudice Sufficient to Justify Denying The Amendment Under The Liberal Amendment Regime of Rule 15(a).**

Nor has Vonage demonstrated any prejudice sufficient to justify denying the motion. Verizon's Motion to Amend discussed at length the principle that a motion to amend under Rule

---

[3]    As in *McNamara*, the court in *Goss* did not actually deny the motion to amend, but remanded it to the district court for further consideration. Neither does *Goss* support the proposition, for which Vonage cites it, that an "undue and prolonged delay" will result in a shifting of the burden to the amending party.

Vonage's other cases are even further afield from the circumstances here. In *Doe v. McMillan*, 566 F.2d 713 (D.C. Cir. 1977), the court denied an attempt to amend the complaint 38 months after the initial filing and after the Supreme Court had already affirmed the dismissal of the action. *Id.* at 720. In *Bilderbeck v. Bureau of Prisons*, 2006 WL 2873477 (E.D.Ky. Oct. 5, 2006), the district court denied a motion for leave to amend that was filed "over two years after the filing of his original complaint; nearly two years after the court denied the prohibition of his transfer; seven months after the close of discovery; and one-and-a-half months after the entry of judgment against him." *Id.* at *2. In *Prime Insurance Syndicate v. United Risk Management*, 2006 WL 2085388 (D.N.J. July 26, 2006), the court denied a motion to amend filed more than three years after the original complaint, where the movant attempted to add a new theory of recovery—the existence of which it admitted it had been aware for almost two years—and "provided no explanation" of the reasons for its delay. *Id.* at *4-6.

DC:498628.4

15(a) is to be freely granted in the absence of "prejudice, futility or bad faith." Motion to Amend at 6 (citing *Davis v. Piper Aircraft Corp.*, 615 F.2d 606, 613 (4th Cir. 1980)). Vonage has made no serious allegation of bad faith, and makes only a cryptic reference to futility. Instead, Vonage appears to assert three types of prejudice that would result from the proposed amendment: (1) that the addition of Verizon's parent company would somehow require Vonage to engage in unspecified additional discovery; (2) that the proposed amendment would somehow require Vonage to "revisit" various elements of its defense to account for the addition of a new party; and (3) that granting the motion would mean that Vonage will have "wasted" time and effort on Verizon's lost profits claim. None of these claims of prejudice is factually accurate, nor are they sufficient to justify a denial of the Motion to Amend under Rule 15. The facts are that plaintiffs have *always* presented (and continue to present) a reasonable-royalty claim that, by law, considers lost profits of the entire Verizon business; have produced all Verizon Communications documents relevant to the claim of harm to the entire Verizon business; have produced corporate witnesses to testify about the entire Verizon business; and have submitted expert reports and testimony that expressly consider the effects on the entire business. No additional information is needed, and discovery had to and did encompass the parent company's entire business all along. There is no prejudice to now aligning the party status to name the parent company.

      **1.**      **Vonage's claim that the amendment will require it to conduct additional discovery is incorrect, and is insufficient grounds on which to base a finding of undue prejudice.**

Vonage's claims of prejudice arise in part from its conclusory and unspecific assertion that the addition of Verizon Communications Inc. as a party will somehow necessitate additional discovery on various issues relating to damages calculations. *See* Opposition at 8, 10. For the

7

following reasons, Verizon believes that this statement is incorrect, and that Vonage is simply attempting to manufacture a claim of undue prejudice to defeat the Motion to Amend.

First, Vonage is incorrect when it denies that Verizon has been treated as one entity throughout discovery and every other aspect of this case. Although the Verizon family includes the parent company and a number of other entities, Verizon produced witnesses and documents from the relevant entities, without regard to whether they were an actual plaintiff in the case. For instance, Verizon produced numerous documents, as well as Rule 30(b)(6) witness Nancy Gofus, from Verizon Business; Verizon produced numerous documents, as well as Rule 30(b)(6) witness Steve Smith, from Verizon Wireless; and Verizon produced numerous documents, and Rule 30(b)(6) witness Bob Ingalls, from Verizon's Domestic Telecom entity.

Second, in its Motion to Amend Verizon demonstrated that, in calculating appropriate remedies in this case, <u>both</u> parties' damages experts treated the Verizon corporate family as a *single economic entity*. *See* Motion to Amend at 8 (citing expert reports of Steven Shavell and John C. Jarosz). Vonage does not—and cannot—dispute that for purposes of damages calculations and even forward-looking harm both parties treated Verizon as a single economic entity, utilizing the financial reporting of the parent company in their calculations. *See* Motion to Amend at 8. In fact, no other company in the Verizon family does any reporting. Verizon's SEC filings, as well as other financial documents produced in discovery, establish that Verizon Communications owns and reports the profits of its operating subsidiaries, including Verizon Wireless, Verizon Business, and Verizon Domestic Telecom. *See* excerpts of Verizon Communications Inc. 2005 Annual Report on Form 10-K (attached hereto as Exhibit 1).

Thus, the parties *have* treated the Verizon corporate family as a single economic entity for all relevant purposes, both as to discovery and damages calculations. Vonage's conclusory

and unspecific claim that additional discovery will somehow be needed to assess the impact of

the addition of Verizon's parent company as a plaintiff is baseless.  Perhaps most tellingly,

Vonage previously noticed—but later withdrew—the deposition of Laura Cardinale, a financial

witness who would have explained the flow of revenue from the operating subsidiaries to

Verizon Communications Inc., the parent.  That deposition would have provided Vonage with

exactly the information the lack of which it now claims is prejudicial—but it decided, for

strategic reasons of its own, not to pursue that information.

   In any event, even if some additional discovery were necessary, which Verizon obviously

disputes, that would not be sufficient reason to deny the motion for leave to amend, especially

since trial is still six weeks away.

    **2.**  **Vonage's claim that it will need to "revisit" various elements of its damages case is false, and in any event is not grounds for a finding of prejudice.**

   Vonage asserts that "[h]ad Verizon timely sought the addition of Verizon

Communications Inc. as a plaintiff . . . Vonage would have followed a different discovery

strategy regarding Verizon's damages claims," and that "if amendment is granted, Vonage now

will need to revisit the damage theories that remain in the case and the assumptions underlying

the damage experts' respective reasonably royalty calculations, as well as the propriety of some

of the factors considered in connection with Verizon's application for a permanent injunction."

Opposition at 9.  But this contention is entirely conclusory and unspecific.  It cites no concrete

subjects that are new and need to be revisited.  That is enough to reject the contention.

   A need to "revisit" certain issues, where there is no concrete showing of a

disproportionate burden, does not demonstrate undue prejudice necessary to deny a motion to

amend under Rule 15.  In the absence of a showing of surprise or some extraordinary burden, the

alleged need to "revisit" a few limited elements of the damages case is little more than an inconvenience; and mere "inconvenience" does not constitute prejudice. *Cuffy v. Getty Refining & Marketing Co.* 648 F.Supp. 802, 806 (D.Del. 1986). Moreover, even if Vonage had demonstrated the amendment would require Vonage to conduct additional depositions or discovery—and it has made no such showing—the appropriate remedy would be an order permitting limited inquiry into those areas specifically and convincingly identified by Vonage as being necessary for Vonage to defend the case.

A party opposing a motion for leave to amend a pleading on grounds of prejudice must identify the claimed prejudice with particularity; conclusory assertions of prejudice are not enough. *See, e.g., RNB Garments Phillipines Inc. v. Lau*, 1999 WL 796175 at *2 (S.D.N.Y. Oct. 5, 1999) (permitting amendment where opposing party failed to "identify any particular prejudice it will suffer through [the] amendment" and instead merely asserting "in conclusory terms that the amendment 'will require additional discovery and re-planning of trial strategy'"); *McCurdy v. Westwood Capital Mgmt. Co.*, 1999 WL 3391494 at *3 (E.D.Pa. May 28, 1999) (permitting amendment where opposing party offered only "conclusory allegations" that it would "need additional time to take discovery in light of the new allegations").

The essence of "prejudice" in this context is not mere burden or inconvenience, but a *merits*–focused issue, namely, injury to the non-movant's "ability to put forth and prove his claim." *McDermott, Ltd. v. Moretz*, 898 F.2d 418, 422 n.2 (4th Cir. 1990); *see also Heyl & Patterson Int'l Inc. v. F.D. Rich Housing*, 663 F.2d 419, 426 (3d Cir.1981) (stating that to demonstrate prejudice, a non-movant must "show that it was unfairly disadvantaged *or deprived of the opportunity to present facts or evidence* which it would have offered had the amendments been timely") (emphasis added); *Commodity Specialists Co. v. Workman*, 1999 WL 588199 (D.

10

Kan. June 18, 1999) (permitting amendment by plaintiff where defendant failed to "claim any specific way in which he will suffer any undue prejudice or difficulty in defending the lawsuit if the court permits the amendment"). Vonage has shown nothing of the kind. What it seeks, to the contrary, is simply to *avoid* a fair trial on the merits of infringement and harm.

Vonage's assertion that it "would have followed a different discovery strategy of Verizon's damages claims" (Opposition at 9) is the very definition of a conclusory assertion of prejudice: Vonage does not identify how its strategy would have differed, or what result that different strategy might have yielded. *Cf. RNB Garments Phillipines Inc. v. Lau*, 1999 WL 796175 at *2 (permitting amendment where opposing party asserted "in conclusory terms that the amendment 'will require additional discovery and re-planning of trial strategy'"). Similarly devoid of concrete content, and downright illogical, is Vonage's assertion the amendment would require it "to revisit the damage theories that remain in the case and the assumptions underlying the damage experts' respective reasonable royalty calculations." Opposition at 9. By Vonage's own account, Verizon has not added a new damages claim, but merely dropped one damages claim (retrospective lost profits); Verizon has *always* pressed a reasonable royalty claim (which, by law, takes account of lost profits). Thus, Vonage has *always* know that it had to explore "the assumptions underlying the damage experts' respective reasonable royalty calculations." Opposition at 9. Likewise, Vonage offers no explanation for its conclusory assertion that the amendment would require it to revisit "the propriety of some of the factors considered in connection with Verizon's application for a permanent injunction" (Opposition at 9). Those factors have always been in the case, and Verizon's expert Professor Shavell, in laying out the basis for the injunction request, based his analysis on harm to the entire Verizon business.

3.    **Vonage's assertions of "retrospective" prejudice are inconsistent with the law of this Circuit.**

The third instance of alleged prejudice identified by Vonage is even less compelling than the first two.  Vonage asserts that it "directed substantial time, effort, and resources to legally assess and address Verizon's lost profit theory," and that "Vonage would not have devoted any of its seven hours for the deposition of Verizon's proposed damages expert addressing lost profits, and would have explored other areas."  Opposition at 9-10.  Indeed, Vonage positively features this claim of prejudice.  Opposition at 3.

But this is not a claim of prejudice from *adding* Verizon Communications at all.  It is about time allegedly wasted on a claim (retrospective lost profits) that Verizon has now dropped.  Verizon needs no permission to drop that claim, and it is not the subject of the Motion to Amend (but an accompanying act to simplify the case).  This contention by Vonage, thus, literally is not an objection to the proposed amendment.

Beyond that, the contention is simply wrong.  Vonage's implication that discovery regarding Verizon's lost profits was wasted effort is misleading to the Court.  As *Union Carbide* establishes in express terms, lost profits is a critical component of a reasonable royalty analysis, and thus it is disingenuous for Vonage to try to convince the Court that lost profits would not have been pursued in discovery.

Finally, this kind of "retrospective" harm is not a legitimate basis for a claim of prejudice.  *See, e.g., McDermott, Ltd. v. Moretz*, 898 F.2d at 421, 422 n.2 (noting that although the defendant's delay in raising a particular defense "led to needless expenditure of effort by the plaintiff . . . it did not prejudice plaintiff's ability to put forth and try to prove his claim").  In the absence of any showing of bad faith on Verizon's party, the "wasted" effort Vonage expended on Verizon's "lost profits" claim is no different than the efforts "wasted" by any litigant in

12

preparing for a possible trial issue that ultimately is not pursued. This often happens in litigation, and is certainly not grounds for a finding of undue prejudice under Rule 15.

**C.    Vonage Has Not Attempted to Rebut Verizon's Demonstration That Verizon Communications Inc. Is Required By Law to Join This Action As a Plaintiff.**

Verizon's Motion to Amend should be granted for another reason as well. As the Motion demonstrated, as a matter of substantive patent law a co-owner of a patent must join as a plaintiff in any infringement action relating to that patent. *See* Motion to Amend at 4-5. Vonage offers no substantive response to this principle; its only reference to the issue comes in a tepid effort to assert that Verizon Communications Inc. lacks standing to join this lawsuit as a plaintiff. *See* Opposition at 6. Given that assignment, as a joint owner of the patents-in-suit Verizon Communications Inc. clearly has standing to join the action, and indeed must do so as a matter of law. Vonage's failure to address this point in its Opposition effectively concedes both its accuracy and its force.

In sum, Verizon has demonstrated good cause for adding its parent company to the Complaint, and Vonage has failed to establish that the amendment would result in any undue prejudice to its ability to defend this lawsuit. Vonage's failure to effectively rebut Verizon's arguments further establishes that Verizon's Motion to Amend be granted.

WHEREFORE, for the foregoing reasons, Verizon respectfully requests that this Court grant Verizon's motion to amend the Complaint to add Verizon Communications Inc. as a plaintiff, and for such further relief as this Court deems just and proper.

Dated: January 11, 2007           Respectfully submitted,

VERIZON SERVICES CORP. and
VERIZON LABORATORIES INC.

_____
Charles B. Molster, III (VA Bar No. 23613)

13

Winston & Strawn LLP
1700 K Street, NW
Washington, DC  20006
(202) 282-5988
(202) 282-5100(fax)
cmolster@winston.com

Dan K. Webb*
Peter C. McCabe*
Peggy M. Balesteri*
Winston & Strawn LLP
35 West Wacker Dr.
Chicago, Illinois 60601
(312) 558-5600

Richard Cullen (VA Bar No. 16765)
Brian C. Riopelle (VA Bar No. 36454)
McGuire Woods LLP
One James Center
901 East Cary Street
Richmond, Virginia 23219-4030
(804) 775-1000

John Thorne (Virginia Corporate Counsel)*
Robert H. Griffen (Virginia Corporate Counsel)*
Verizon Services Corp.
1515 North Courthouse Road
Fifth Floor
Arlington, Virginia 22201
(703) 351-3900

Leonard Charles Suchyta*
Verizon Corporate Services Group Inc.
One Verizon Way
Basking Ridge, NJ 07920
(908) 559-5623


*Counsel for Verizon Services Corp. and Verizon
Laboratories Inc.*

* admitted *pro hac vice*

14

DC:498628.4

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing Verizon's Reply Brief

in Support of Verizon's Motion to Amend Complaint to Add Verizon Communications Inc. As A

Plaintiff to be sent via e-mail and U.S. Mail on this 11th day of January 2007 upon the following:

Scott Doyle
William Bosch
Steven J. Barber
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue
Washington, DC 20036


_____
Charles B. Molster, III

DC:498628.4

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

(Mark one)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the fiscal year ended December 31, 2005

OR

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
For the transition period from _____ to _____

Commission file number 1-8606

# Verizon Communications Inc.
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **23-2259884** |
| (State of incorporation) | (I.R.S. Employer Identification No.) |
| **140 West Street** | |
| **New York, New York** | **10007** |
| (Address of principal executive offices) | (Zip Code) |

### Registrant's telephone number, including area code: (212) 395-1000

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.10 par value | New York, Philadelphia, Boston, Chicago and Pacific Stock Exchanges |

Securities registered pursuant to Section 12(g) of the Act:

None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (Section 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐

VERIZON COMMUNICATIONS INC (Form: 10-K, Received: 03/14/2006 16:16:49)                Page 2 of 227

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

At June 30, 2005, the aggregate market value of the registrant's voting stock held by nonaffiliates was approximately $96,045,598,000.

At January 31, 2006, 2,926,823,217 shares of the registrant's Common Stock were outstanding, after deducting 11,356,177 shares held in treasury.

Documents incorporated by reference:

Portions of the registrant's Annual Report to Shareowners for the year ended December 31, 2005 (Parts I and II).

Portions of the registrant's Proxy Statement prepared in connection with the 2006 Annual Meeting of Shareowners (Part III).

Table of Contents

# PART I
## Item I.  Business

| General |
| --- |

Verizon Communications Inc. (Verizon) is one of the world's leading providers of communications services. Verizon's domestic wireline telecommunications business provides local telephone services, including broadband, in 28 states and Washington, D.C. and nationwide long-distance and other communications products and services. Verizon's domestic wireless business, operating as Verizon Wireless, provides wireless voice and data products and services across the United States using one of the most extensive wireless networks. Information Services operates directory publishing businesses and provides electronic commerce services. Verizon's International segment includes wireline and wireless communications operations and investments in the Americas and Europe. In connection with the closing of the merger with MCI, Inc. (MCI), which occurred on January 6, 2006, Verizon now owns and operates one of the most expansive end-to-end global Internet Protocol (IP) networks which includes over 270,000 domestic and 360,000 international route miles of fiber optic cable and provides access to over 140 countries worldwide. Operating as Verizon Business, we are now better able to provide next-generation IP network services to medium and large businesses and government customers. Stressing diversity and commitment to the communities in which we operate, Verizon has a highly diverse workforce of 250,000 employees, including Verizon Business.

Verizon was formerly known as Bell Atlantic Corporation, which was incorporated in 1983 under the laws of the State of Delaware. We began doing business as Verizon Communications on June 30, 2000, when Bell Atlantic Corporation merged with GTE Corporation.

Our principal executive offices are located at 140 West Street, New York, New York 10007 (telephone number 212-395-1000).

We have four reportable segments, which we operate and manage as strategic business units and organize by products and services. Our segments and their principal activities consist of the following:

| | |
| --- | --- |
| Domestic Telecom | Domestic Telecom provides local telephone services, including voice, DSL, data transport, enhanced and custom calling features, network access, directory assistance, private lines and public telephones in 28 states and Washington, D.C. This segment also provides long distance services, customer premises equipment distribution, video services, data solutions and systems integration, billing and collections and inventory management services. |
| Domestic Wireless | Domestic wireless products and services include wireless voice and data services and equipment sales across the United States. |
| Information Services | Information Services' multi-platform business comprises yellow and white pages directories, SuperPages.com, our online directory and search services, and SuperPages On the Go, our directory and information services on wireless telephones. This segment's operations are principally in the United States. |
| International | International wireline and wireless communications operations and investments in the Americas and Europe. |

You can find additional business information under the heading "Overview" on pages 14 through 15 and segment financial information under the heading "Segment Results of Operations" on pages 20 through 25 and in Note 17 on pages 61 through 63 of the 2005 Verizon Annual Report to Shareowners, which is incorporated herein by reference.

| Domestic Telecom |
| --- |

## Operations

Our Domestic Telecom segment, principally representing our wireline telephone operations, provided approximately 50% of 2005 total operating revenues. Our telephone operations presently serve a territory consisting of 48.8 million access lines in 28 states and Washington, D.C. This segment also provides long distance and other telecommunication services. Domestic Telecom provides mainly two types of telecommunications services:

- Exchange telecommunications service is the transmission of telecommunications among customers located within a local calling area within a local access and transport area (LATA). Examples of exchange telecommunications services include switched local residential and business services, local private line voice and data services and Centrex services. We also provide toll services within a LATA (intraLATA long distance) and toll services outside a LATA (interLATA long distance).

- Exchange access service links a customer's premises and the transmission facilities of other telecommunications carriers, generally interLATA carriers. Examples of exchange access services include switched access and special access services.

We have organized our Domestic Telecom segment into four marketing units operating across our telephone subsidiaries. The units focus on specific markets. We are not dependent on any single customer. Our telephone operations remain responsible within their

respective service areas for the provision of telephone services, financial performance and regulatory matters.

The *Enterprise* unit markets communications and information technology and services to large businesses and to departments, agencies and offices of the executive, judicial and legislative branches of the federal, state and local governments. These services include voice switching/processing services (e.g., dedicated private lines, custom Centrex, call management and voice messaging), end-user networking (e.g.,

1

Table of Contents

credit and debit card transactions and personal computer-based conferencing, including data and video), internetworking (establishing links between the geographically disparate networks of two or more companies or within the same company), network optimization (disaster avoidance and 911 service) and other communications services. The Enterprise unit also provides data transmission, Internet and network integration services, interLATA long distance services, network monitoring services and telecommunications equipment sales to medium and large businesses. Revenues in 2005 were approximately $5.6 billion, representing approximately 15% of Domestic Telecom's aggregate revenues.

The *Retail* unit markets communications and information services to residential customers and to small and medium-sized businesses within our territory, including our long distance services and Internet access services. Our long distance subsidiary provides national and international long distance services in all 50 states to residential and business customers, including calling cards, 800/888 services and operator services. This unit also provides operator and pay telephone services and sells customer premises equipment. Revenues in 2005 were approximately $21.8 billion, representing approximately 58% of Domestic Telecom's aggregate revenues. These revenues were derived primarily from the provision of telephone services to residential users.

The *Partner Solutions Wholesale* unit markets our network operations, which principally includes our carrier access and telecom industry services. Revenues in 2005 were approximately $9.2 billion, representing approximately 24% of Domestic Telecom's aggregate revenues. Approximately 67% of total wholesale revenues were derived from interexchange carriers (switched and special access). The remaining revenues come from our telecom industry services, principally from other local exchange carriers which resell network connections to their own customers.

The *Network* unit is principally responsible for the construction and maintenance of our telephone operations' networks. This unit is also responsible for the procurement and management of inventory and supplies for our subsidiaries and sells materials and logistic services to third-party carriers. Revenues in 2005 (after eliminations and combined with all other Domestic Telecom revenues) were approximately $1.0 billion, representing approximately 3% of Domestic Telecom's aggregate revenues.

## Telecommunications Act of 1996

The Telecommunications Act of 1996, regulatory and judicial actions and the development of new technologies, products and services have created opportunities for alternative telecommunication service providers, many of which are subject to fewer regulatory constraints. We are unable to predict definitively the impact that the ongoing changes in the telecommunications industry will ultimately have on our business, results of operations or financial condition. The financial impact will depend on several factors, including the timing, extent and success of competition in our markets, the timing and outcome of various regulatory proceedings and any appeals, and the timing, extent and success of our pursuit of new opportunities resulting from the Telecommunications Act of 1996 and technological advances.

## FCC Regulation and Interstate Rates

Our services are subject to the jurisdiction of the Federal Communications Commission (FCC) with respect to interstate telecommunications services and other matters for which the FCC has jurisdiction under the Communications Act of 1934, as amended.

### Broadband

The FCC has adopted a series of orders that recognize the competitive nature of the broadband market, and impose lesser regulatory requirements to broadband services and facilities than apply to narrowband. With respect to facilities, the FCC has determined that certain unbundling requirements that apply to narrowband facilities do not apply to broadband facilities such as fiber to the premise loops and packet switches. With respect to services, the FCC has concluded that broadband Internet access services offered by telephone companies and their affiliates qualify as largely deregulated information services. The same order also concluded that telephone companies may offer the underlying broadband transmission services that are used as an input to Internet access services through private carriage arrangements on negotiated commercial terms. The FCC's order addressing the appropriate regulatory treatment of broadband Internet access services is the subject of a pending appeal.

### Video

The FCC has a body of rules that apply to cable operators under Title VI of the Communications Act of 1934, and these rules also generally apply to telephone companies that provide cable services over their networks. In addition, companies that provide cable service over a cable system generally must obtain a local cable franchise. The FCC currently is conducting a rulemaking proceeding to determine whether the local franchising process is serving as a barrier to entry for new providers of video services, like Verizon. In this proceeding, the FCC is evaluating the scope of its authority over the local franchise process and is considering adopting rules under Section 621 of the Communications Act of 1934 to ensure that the local franchising process does not undermine competitive entry.

### Interstate Access Charges and Intercarrier Compensation

The current framework for interstate access rates was established in the Coalition for Affordable Local and Long Distance Services

Table of Contents

toll service is not provided) permit other carriers to offer intraLATA toll services within the state. InterLATA toll calls terminate outside the LATA of origination. We now offer long distance services throughout the United States, capping a seven-year effort. Our authority in Alaska is limited to interstate and international services. A number of our major competitors in the long distance business have strong brand recognition and existing customer relationships.

*Alternative Access Services*

A substantial portion of our telephone operations' revenues from business and government customers is derived from a relatively small number of large, multiple-line subscribers.

We face competition from alternative communications systems, constructed by large end-users, interexchange carriers and alternative access vendors, which are capable of originating and/or terminating calls without the use of our plant. The FCC's orders requiring us to offer collocated interconnection for special and switched access services have enhanced the ability of such alternative access providers to compete with us.

Other potential sources of competition include cable television systems, shared tenant services and other noncarrier systems which are capable of bypassing our telephone operations' local plant, either partially or completely, through substitution of special access for switched access or through concentration of telecommunications traffic on fewer of our telephone operations' lines, and through substitution of UNEs for special access services.

*Voice over Internet Protocol Services*

Our wireline telecommunications services also face increasing competition from companies which provide Voice over Internet Protocol (VoIP) services. These services use the Internet or private broadband networks to transmit voice communications. VoIP services are available from a wide range of companies including cable companies, long-distance companies, national VoIP providers and regional service providers.

*Wireless Services*

Wireless services also constitute a significant source of competition to our wireline telecommunications services, especially as wireless carriers (including Verizon Wireless) expand and improve their network coverage and continue to lower their prices to end-users. As a result, more end-users are substituting wireless services for basic wireline service. Wireless telephone services can also be used for data transmission.

*Public Telephone Services*

The growth of wireless communications has significantly decreased usage of public telephones, as more customers are substituting wireless services for public telephone services. In addition, we face competition from other providers of public telephone services.

*Operator Services*

Our operator services product line faces competition from alternative operator services providers and Internet service providers.

| Domestic Wireless |
| --- |

**Operations**

Our Domestic Wireless segment provides wireless voice and data services and equipment sales in the United States, principally through Verizon Wireless.

Verizon Wireless is the industry-leading wireless communications provider in the United States in terms of profitability, as measured by operating income. Verizon Wireless has the second largest customer base of any U.S. wireless provider, with 51.3 million wireless subscribers as of December 31, 2005, and provides wireless voice and data services across one of the most extensive networks in the United States. Approximately 282 million people reside in areas of the U.S. in which we have FCC licenses to offer our services and approximately 250 million people reside in areas covered by our service. This coverage includes approximately 90% of the population in our licensed areas and 49 of the 50 and 98 of the 100 most populated U.S. metropolitan areas.

Wireless licenses are granted by the FCC for an initial 10-year term and are renewable for successive 10-year terms. To date, all Verizon Wireless and predecessor company wireless licenses have been successfully renewed.

**Background**

The wireless joint venture was formed in April 2000 in connection with the combination of the U.S. wireless operations and interests of Verizon and Vodafone Group Plc (Vodafone). The wireless joint venture operates as Verizon Wireless. Verizon owns a controlling 55% interest in Verizon Wireless and Vodafone owns the remaining 45%.

11

Table of Contents

## Recent Acquisitions

On March 4, 2005, we completed the purchase from Qwest Wireless, LLC of all of its personal communications services (PCS) licenses and related network assets for $419 million in cash, including post-closing adjustments. The licenses cover a population of approximately 31 million in 62 markets, and will provide additional spectrum capacity in certain of our existing major markets, such as Denver, Portland, Phoenix, Salt Lake City and Seattle.

On April 13, 2005, we completed the purchase of all of the stock of NextWave Telecom Inc., whereby we acquired 23 PCS licenses for $3,003 million in cash. The licenses cover a population of approximately 73 million and will provide spectrum capacity in key markets such as New York, Los Angeles, Boston, Washington D.C. and Detroit, and will expand our footprint into Tulsa, Oklahoma.

On May 11, 2005, we completed the purchase from Metro PCS, Inc. of its PCS license in the San Francisco basic trading area for $230 million in cash. The license covers a population of approximately 7 million and will provide spectrum capacity in the San Francisco, Oakland and San Jose markets.

On February 15, 2005, the FCC's auction of broadband personal communications services licenses ended and Verizon Wireless and Vista PCS, LLC were the highest bidders for 63 licenses totaling approximately $697 million. On May 13, 2005, the licenses won by Verizon Wireless were granted by the FCC. The licenses won by Vista PCS remain subject to FCC approval.

## Competition

There is substantial competition in the wireless telecommunications industry. We expect competition to intensify as a result of the higher penetration levels that currently exist in the industry, ongoing industry consolidation, the development and deployment of new technologies, the introduction of new products and services, new market entrants, the availability of additional spectrum, both licensed and unlicensed, and regulatory changes. Other wireless providers, including other cellular and PCS operators and resellers, serve each of the markets in which we operate. We currently provide service to 49 of the top 50 markets in the U.S., and each of these 49 markets is served by other competing wireless providers. Competition also may increase if smaller, stand-alone wireless providers transfer licenses to larger, better capitalized and more experienced wireless providers. In addition, resellers that buy bulk wholesale service from facilities-based carriers for resale provide another set of differentiated competitors in the marketplace. Also, as wireless data proliferates, content will become an increasingly significant factor in the appeal of these services. This may give content providers and other participants in the wireless value chain opportunities for increased leverage and/or opportunities to compete for wireless data revenues.

We compete primarily against three other national wireless service providers: Cingular Wireless LLC, Sprint Nextel Corporation and T-Mobile USA, Inc. In addition, in many markets we also compete with regional carriers, such as ALLTEL Corporation and US Cellular Corporation.

We believe that the following are the most important competitive factors in our industry:

Network reliability, capacity and coverage: Lower prices, improved service quality and new service offerings have led to increased minutes of use per customer. As a result, the ability to keep pace with network capacity needs and offer highly reliable national coverage through one's own network is important. We have an extensive national network, and we continue to look for expansion opportunities through the build-out of existing licenses, acquisitions and/or spectrum leasing. We own licenses that cover much of the country but we will need to spend significant amounts to expand our capacity and extend our coverage area and maintain and improve the quality of our network. Our competitors also have these needs and they are using similar means to address them.

Pricing: Service and equipment pricing is an important area in which wireless carriers compete. We seek to compete in this area by offering our customers services and equipment that they will regard as the best available value for their money.

Customer service: Quality customer service is essential to ensure that existing customers do not terminate service and to obtain new customers. We believe that our quality customer service will be a key factor in retaining our customers and in attracting new customers and those who want to switch from other carriers. We are very focused on continually enhancing our customer service. Our competitors also recognize the importance of customer service and are also focusing on improving the customer experience.

Product Development: As wireless technologies develop and wireless broadband networks proliferate, continued customer and revenue growth will be increasingly dependent on the development of new and enhanced products and services. We are committed to continue pursuing the development, evaluation and rapid deployment of new and innovative devices and customer solutions, both independently and in collaboration with application service providers.

Distribution: Key to achieving sales success in the wireless industry is the reach and quality of sales channels and distribution points. We believe that the optimal mix of direct, indirect and wholesale distribution channels is an important ingredient in achieving industry-leading profitability. A goal of our distribution strategy is to increase sales through our company-operated stores and our outside sales team, as well as through telemarketing and web-based sales and fulfillment capabilities. Supplementing this is an extensive indirect distribution network of retail outlets and prepaid replenishment locations, original equipment manufacturers and

VERIZON COMMUNICATIONS INC (Form: 10-K, Received: 03/14/2006 16:16:49)          Page 20 of 227

value-added distributors, as well as various resellers who buy our service on a wholesale basis.

<u>Capital resources:</u> In order to expand the capacity and coverage of their networks and introduce new products and services, wireless providers require significant capital resources. We generate significant cash flow from operations. Some of our competitors also have significant cash flow.

12

## Selected Financial Data Verizon Communications Inc. and Subsidiaries

|  | 2005 | 2004 | 2003 | 2002 | 2001 |
|---|---|---|---|---|---|
| | | | | (dollars in millions, except per share amounts) | |
| **Results of Operations** | | | | | |
| Operating revenues | $ 75,112 $ | 71,283 $ | 67,468 $ | 67,056 $ | 66,513 |
| Operating income | 14,814 | 13,117 | 7,407 | 14,877 | 11,402 |
| Income before discontinued operations, extraordinary items and cumulative effect of accounting change | 7,397 | 7,261 | 3,460 | 4,591 | 545 |
| Per common share -- basic | 2.67 | 2.62 | 1.26 | 1.68 | .20 |
| Per common share -- diluted | 2.65 | 2.59 | 1.25 | 1.67 | .20 |
| Net income | 7,397 | 7,831 | 3,077 | 4,079 | 389 |
| Net income available to common shareowners | 7,397 | 7,831 | 3,077 | 4,079 | 389 |
| Per common share – basic | 2.67 | 2.83 | 1.12 | 1.49 | .14 |
| Per common share – diluted | 2.65 | 2.79 | 1.12 | 1.49 | .14 |
| Cash dividends declared per common share | 1.62 | 1.54 | 1.54 | 1.54 | 1.54 |
| | | | | | |
| **Financial Position** | | | | | |
| Total assets | $ 168,130 $ | 165,958 $ | 165,968 $ | 167,468 $ | 170,795 |
| Long-term debt | 31,869 | 35,674 | 39,413 | 44,003 | 44,873 |
| Employee benefit obligations | 18,819 | 17,941 | 16,754 | 15,392 | 11,895 |
| Minority interest | 26,754 | 25,053 | 24,348 | 24,057 | 21,915 |
| Shareowners' investment | 39,680 | 37,560 | 33,466 | 32,616 | 32,539 |

• Significant events affecting our historical earnings trends in 2003 through 2005 are described in Management's Discussion and Analysis of Results of Operations and Financial Condition.

• 2002 data includes gains on investments and sales of businesses and other special and/or non-recurring items.

• 2001 data includes losses on investments, severance benefits charges, and other special and/or non-recurring items.

## Management's Discussion and Analysis of Results of Operations and Financial Condition

### Overview

Verizon Communications Inc. (Verizon) is one of the world's leading providers of communications services. Verizon's domestic wireline telecommunications business provides local telephone services, including broadband, in 28 states and Washington, D.C. and nationwide long-distance and other communications products and services. Verizon's domestic wireless business, operating as Verizon Wireless, provides wireless voice and data products and services across the United States using one of the most extensive wireless networks. Information Services operates directory publishing businesses and provides electronic commerce services. Verizon's International segment includes wireline and wireless communications operations and investments in the Americas and Europe. In connection with the closing of the merger with MCI, Inc. (MCI), which occurred on January 6, 2006, Verizon now owns and operates one of the most expansive end-to-end global Internet Protocol (IP) networks which includes over 270,000 domestic and 360,000 international route miles of fiber optic cable and provides access to over 140 countries worldwide. Operating as Verizon Business, we are now better able to provide next-generation IP network services to medium and large businesses and government customers. Stressing diversity and commitment to the communities in which we operate, Verizon has a highly diverse workforce of 250,000 employees, including Verizon Business.

The sections that follow provide information about the important aspects of our operations and investments, both at the consolidated and segment levels, and include discussions of our results of operations, financial position and sources and uses of cash. In addition, we have highlighted key trends and uncertainties to the extent practicable. The content and organization of the financial and non-financial data presented in these sections are consistent with information used by our chief operating decision makers for, among other purposes, evaluating performance and allocating resources. We also monitor several key economic indicators as well as the state of the economy in general, primarily in the United States where the majority of our operations are located, in evaluating our operating results and analyzing and understanding business trends. While most key economic indicators, including gross domestic product, impact our operations to some degree, we have noted higher correlations to housing starts, non-farm employment, personal consumption expenditures and capital spending, as well as more general economic indicators such as inflation and unemployment rates.

Our results of operations, financial position and sources and uses of cash in the current and future periods reflect Verizon management's focus on the following four key areas:

- Revenue Growth – Our emphasis is on revenue transformation, devoting more resources to higher growth markets such as wireless, wireline broadband connections, including digital subscriber lines (DSL) and fiber optics to the home (Verizon's FiOS data product), long distance and other data services as well as expanded services to business markets, rather than to traditional wireline voice services, where we have been experiencing access line losses. In 2005, revenues from these growth areas increased by 15% compared to 2004 and represent 58% of our total revenues, up from 53% of total revenues in 2004 and 47% in 2003. Verizon reported consolidated revenue growth of 5.4% in 2005 compared to 2004, led by 16.8% higher revenue at Domestic Wireless and 10.5% total data revenue growth at Domestic Telecom. Verizon added 7,521,000 wireless customers, 1,659,000 broadband connections and 992,000 long distance lines. Excluding the revenues of Verizon's Hawaii wireline and directory operations, which were sold in 2005, consolidated revenue growth would have been 6.0% in 2005 compared to 2004.

- Operational Efficiency – While focusing resources on growth markets, we are continually challenging our management team to lower expenses, particularly through technology-assisted productivity improvements including self-service initiatives. The effect of these and other efforts, such as the 2003 labor agreements and voluntary separation plans, real estate consolidations and call center routing improvements, has been to significantly change the company's cost structure and maintain stable operating income margins. Real estate consolidations include our decision to establish Verizon Center for the leadership team. In 2005, Verizon restructured its management retirement benefit plans such that management employees will no longer earn pension benefits or earn service towards the company retiree medical subsidy after June 30, 2006, after receiving an 18-month enhancement of the value of their pension and retiree medical benefits, but will receive higher savings plan matching contributions. The net effect of these management benefit plan changes is expected to be a reduction in pretax benefit expenses of approximately $3 billion over 10 years. In addition, Domestic Telecom's salary and benefits expenses have declined in 2005 and 2004 as a result of the 2003 voluntary separation plan. Workforce levels in 2005 and 2004 increased to 217,000 and 209,000, respectively, from 200,000 as of December 31, 2003 driven by wireless and wireline broadband growth markets.

- Capital Allocation – Verizon's capital expenditures continue to be directed toward growth markets. High-speed wireless data (Evolution-Data Optimized, or EV-DO) services, replacement of copper access lines with fiber optics to the home, as well as expanded services to business markets are examples of areas of capital expenditures in support of these growth markets. In 2005, Verizon achieved targeted increased capital expenditures of $15,324 million compared to 2004 capital expenditures of $13,259 million in support of growth initiatives. Approximately 69% of 2005 capital expenditures related to growth initiatives. In 2006, Verizon management expects capital expenditures to be in the range of $15.4 billion to $15.7 billion, excluding capital expenditures associated with MCI. Including MCI, capital expenditures are expected to be $17.0 billion to $17.4 billion in 2006. In addition to capital expenditures, Domestic Wireless continues to acquire wireless spectrum in support of expanding data applications and customer base. In 2005, this included participation in the Federal Communications Commission (FCC) Auction 58 and the NextWave Telecom Inc. (NextWave) and Qwest Wireless, LLC acquisitions.

- Cash Flow Generation – The financial statements reflect the emphasis of management on not only directing resources to growth markets, but also using cash provided by our operating and investing activities for the repayment of debt in addition to providing a competitive dividend to our shareowners. In 2005, Verizon increased its dividend by 5.2% to $1.62 per share from $1.54 per share

in 2004. At December 31, 2005, Verizon's total debt was $39,010 million, a decrease of $257 million from $39,267 million at December 31, 2004.

However, Verizon's balance of cash and cash equivalents at December 31, 2005 of $776 million declined by $1,514 million from $2,290 million at December 31, 2004.

Supporting these key focus areas are continuing initiatives to package more effectively and add more value to our products and services. In 2004, Verizon announced a deployment expansion of FiOS in several states in our service territory. As of the end of 2005, we have met our goal of passing three million premises by the end of 2005. We have achieved a penetration rate of 9% in markets where Verizon has been actively marketing for more than six months and 14% in markets where we have been marketing for nine months, and continue to progress toward our goal of reaching 30% penetration in five years. In 2005, Verizon began offering video on the FiOS network in three markets and expects to begin offering video services in markets in New York, Massachusetts and California in the first quarter of 2006. In Keller, Texas, the first market that FiOS TV has been offered, we have achieved a 21% penetration rate in four months. FiOS TV includes a collection of all-digital programming with more than 375 channels, 47 music channels and 20 high-definition television channels. Innovative product bundles include local wireline, long distance, wireless and broadband services for consumer and general business retail customers. These efforts will also help counter the effects of competition and technology substitution that has resulted in access line losses that have contributed to declining Domestic Telecom revenues over the past several years.

Verizon Business will serve medium and large businesses and government customers from related business operations within Domestic Telecom that market communications and information technology and services to large businesses and governments and MCI's global, corporate and government customers group. Beginning in 2006, Verizon will be positioned as a global communications solutions provider. In connection with this merger, Verizon expects to achieve merger synergies with a net present value of approximately $8 billion; annual synergies over the next three years are estimated to be $550 million in 2006, $825 million in 2007 and $1,100 million in 2008. Integration costs over that same three year period are estimated to be $400 million in 2006, $325 million in 2007 and $275 million in 2008 and integration capital expenditures are estimated to be between $1.6 billion and $1.9 billion, of which $550 million is expected to be spent in 2006. Examples of these synergies include moving more voice and data traffic, such as long-haul long distance traffic, onto Verizon's networks rather than paying third party access providers and duplicate work force reductions.

At Domestic Wireless, we will continue to execute on the fundamentals of our network superiority and value proposition to deliver growth for the business while at the same time provide new and innovative products and services for our customers. We are continuing to expand the areas where we are offering BroadbandAccess, our EV-DO service. During 2005, Domestic Wireless expanded its broadband network to 180 major metropolitan areas, covering over 150 million people across the United States. We have achieved our goal of reaching approximately one-half of the U.S. population by the end of 2005. During 2005, we launched V CAST, our consumer broadband wireless service offering, which provides customers with unlimited access to a variety of video and gaming content on EV-DO handsets. In the first year of V CAST service, customers received 11.8 million downloads. Beginning in 2006, Domestic Wireless launched V CAST Music, a comprehensive mobile music service in which customers can download music over the air directly to their wireless phones and to their personal computers.

In December 2005, Verizon announced that it is exploring divesting Information Services through a spin-off, sale or other strategic transaction. However, since this process is still ongoing, Information Services' results of operations, financial position and cash flows remain in Verizon's continuing operations.

## Consolidated Results of Operations

In this section, we discuss our overall results of operations and highlight special and non-recurring items. In the following section, we review the performance of our four reportable segments. We exclude the effects of the special and non-recurring items from the segments' results of operations since management does not consider them in assessing segment performance, due primarily to their non-recurring and/or non-operational nature. We believe that this presentation will assist readers in better understanding our results of operations and trends from period to period. This section on consolidated results of operations carries forward the segment results, which exclude the special and non-recurring items, and highlights and describes those items separately to ensure consistency of presentation in this section and the "Segment Results of Operations" section.

The special and non-recurring items include operating results through the sale date of our wireline and directory businesses in Hawaii which operated approximately 700,000 switched access lines and were sold in the second quarter of 2005. These operating results are not in segment results of operations to enhance comparability. Segment results also do not include discontinued operations in segment income. See "Other Consolidated Results – Discontinued Operations" for a discussion of these results of operations. In addition, consolidated operating results include several other events and transactions that are highlighted because of their non-recurring and/or non-operational nature. See "Special Items" for additional discussion of these items.

| Consolidated Revenues | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | (dollars in millions) | |
| Years Ended December 31, | 2005 | 2004 | % Change | 2004 | 2003 | % Change |
| Domestic Telecom | $ 37,616 | $ 38,021 | (1.1)% | $ 38,021 | $ 39,055 | (2.6)% |
| Domestic Wireless | 32,301 | 27,662 | 16.8 | 27,662 | 22,489 | 23.0 |
| Information Services | 3,452 | 3,549 | (2.7) | 3,549 | 3,763 | (5.7) |
| International | 2,193 | 2,014 | 8.9 | 2,014 | 1,949 | 3.3 |

## 2005 Compared to 2004

Consolidated revenues in 2005 were higher by $3,829 million, or 5.4% compared to 2004 revenues. This increase was primarily the result of significantly higher revenues at Domestic Wireless and higher International revenues, partially offset by lower revenues at Domestic Telecom and the sale of Hawaii operations in the second quarter of 2005.

Domestic Wireless's revenues increased by $4,639 million, or 16.8% in 2005 compared to 2004 due to a 7.5 million, or 17.2% increase in customers to 51.3 million as of December 31, 2005 and higher equipment and other revenue, partially offset by a decrease in average revenue per customer per month. Increased equipment and other revenues was principally the result of an increase in wireless devices sold together with an increase in revenue per unit sold. Average revenue per customer per month decreased 1.5% to $49.49 in 2005 compared to 2004, primarily due to pricing changes in early 2005, partially offset by a 71.7% increase in data revenue per customer in 2005 compared to 2004, driven by increased use of our messaging and other data services. Data revenues were $2,243 million in 2005 compared to $1,116 million in 2004. Average minutes of use (MOUs) per customer increased to 665, or 16.1% in 2005 compared to 2004.

Domestic Telecom's revenues in 2005 were lower than 2004 by $405 million, or 1.1% primarily due to lower revenues from local services, partially offset by higher network access and long distance services revenues. The decline in local service revenues of $669 million, or 3.7% in 2005 was mainly due to lower demand and usage of our basic local exchange and accompanying services, as reflected by declines in switched access lines in service of 6.7% in 2005, driven by the effects of competition and technology substitution. Our network access revenues increased by $159 million, or 1.3% in 2005 principally due to increased DSL and carrier special access revenues, partially offset by the impact of decreasing switched MOUs and access lines and mandatory price reductions associated with federal and state price cap filings and other regulatory decisions. We added 1.7 million new broadband connections, for a total of 5.1 million lines in service at December 31, 2005, an increase of 47.6% compared to 3.5 million lines in service at December 31, 2004. Switched MOUs declined by 7.1% in 2005 compared to 2004 reflecting the impact of access line loss and technology substitution. Network access revenues also increased in 2005 as a result of a favorable adjustment associated with a recent regulatory decision. Long distance service revenues increased $206 million, or 5.0% in 2005 principally as a result of customer growth from our interLATA long distance services. In 2005, we added 1.0 million long distance lines, for a total of 18.4 million long distance lines nationwide, representing a 5.7% increase from December 31, 2004. The introduction of our Freedom service plans continues to stimulate growth in long distance services. As of December 31, 2005, approximately 53% of our local wireline customers have chosen Verizon as their long distance carrier.

Lower revenue of Hawaii operations sold of $393 million, or 66.1% in 2005 compared to 2004 was the result of the sale during the second quarter of 2005 of our wireline and directory operations in Hawaii.

## 2004 Compared to 2003

Consolidated revenues in 2004 were higher by $3,815 million, or 5.7% compared to 2003 revenues. This increase was primarily the result of significantly higher revenues at Domestic Wireless, partially offset by lower revenues at Domestic Telecom.

Domestic Wireless's revenues increased by $5,173 million, or 23.0% in 2004 compared to 2003 as a result of 6.3 million net customer additions and higher revenue per customer per month, including higher data revenue per customer. Average revenue per customer per month was $50.22, or 2.8% higher in 2004 compared to 2003, primarily due to a larger number of customers on higher access price plan offerings as well as an increase in data revenues per subscriber. Data revenues were $1,116 million in 2004 compared to $449 million in 2003. These increases were partially offset by decreased roaming revenue due to bundled pricing.

Domestic Telecom's revenues in 2004 were lower than 2003 by $1,034 million, or 2.6% primarily due to lower local and network access services, partially offset by higher long distance revenues. The decline in local service revenues of $916 million, or 4.8% in 2004 was mainly due to lower demand and usage of our basic local exchange and accompanying services, as reflected by a decline in switched access lines in service of 4.6% in 2004. These revenue declines were mainly driven by the effects of competition, regulatory pricing rules for unbundled network elements (UNEs) and technology substitution. Network access revenues declined by $486 million, or 3.9% in 2004 compared to 2003 principally due to decreasing MOUs and access lines, as well as mandatory price reductions associated with federal and state price cap filings and other regulatory decisions. Switched MOUs declined in 2004 by 5.7% compared to 2003, reflecting the impact of access line loss and wireless substitution. Domestic Telecom's long distance service revenues increased $390 million, or 10.4% in 2004 compared to 2003, principally as a result of customer growth from our interLATA long distance services. In 2004, we added 2.3 million long distance lines, for a total of 17.7 million long distance lines nationwide, representing a 15.5% increase from December 31, 2003.

## Consolidated Operating Expenses

| Years Ended December 31, | 2005 | 2004 | % Change | 2004 | 2003 | (dollars in millions) % Change |
|---|---|---|---|---|---|---|
| Cost of services and sales | $ 25,469 | $ 23,168 | 9.9% | $ 23,168 | $ 21,701 | 6.8% |
| Selling, general and administrative expense | 21,312 | 21,088 | 1.1 | 21,088 | 24,894 | (15.3) |
| Depreciation and amortization expense | 14,047 | 13,910 | 1.0 | 13,910 | 13,607 | 2.2 |
| Sales of businesses, net | (530) | – | nm | – | (141) | (100.0) |
| Consolidated Operating Expenses | $ 60,298 | $ 58,166 | 3.7 | $ 58,166 | $ 60,061 | (3.2) |

# DOCUMENT #3

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

VERIZON SERVICES CORP., et al.,                )
                                               )
            Plaintiffs,                        )
                                               )
      v.                                       )      Civil Action No:1:06cv682
                                               )
VONAGE HOLDINGS CORP., et al.,                 )
                                               )
            Defendants.                        )

## O R D E R

Before the Court is Plaintiff's Motion for leave to amend the Complaint to add Verizon Communications, Inc., as a Plaintiff (Dkt. no. 210), Defendant's Opposition to Motion to amend the Complaint (Dkt. no. 219), and Verizon's Reply brief in Support of Motion for leave to amend the Complaint to add Verizon Communications, Inc., as a Plaintiff (Dkt. no. 220). For the reasons stated from the bench, it is hereby

**ORDERED,**

Plaintiff's Motion for leave to amend the Complaint to add Verizon Communications, Inc., as a Plaintiff (Dkt. no. 210) is **GRANTED** and the Amended Complaint **SHALL BE DEEMED FILED** on this date. Defendant shall be granted a discrete extension of discovery to February 5, 2007 which shall be conducted consistent with the Court's direction from the bench on this date.

Pursuant to Plaintiff's oral request to extend the January 12, 2007 deadline by which motions *in limine* must be filed, and in consideration of Defendant's opposition thereto, the Court grants such request and the parties must file motions *in limine* not later than January 17, 2007.

Entered this 12th day of January, 2007.

_____
Barry R. Poretz
United States Magistrate Judge

Alexandria, Virginia